UNITED STATES of America, Plaintiff–Appellee,

v.

Anthony MEYERS, a/k/a Tony Meyers, Defendant–Appellant.

No. 87–3087.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted March 10, 1988.

Decided June 2, 1988.

Edmund F. Sheehy, Jr., Cannon & Sheehy, Helena, Mont., for defendant-appellant.

Pete Dunbar, Asst. U.S. Atty., Billings, Mont., for plaintiff-appellee.

Before TANG and CANBY, Circuit Judges, and THOMPSON,* District Judge.

TANG, Circuit Judge:

Anthony Meyers (Meyers) appeals his conviction following jury trial for conspiracy to distribute cocaine in violation of 21 U.S.C. §§ 846, 841(a)(1). Meyers challenges the sufficiency of the evidence against him and contends the district court erred in (1) denying his motion to transfer place of prosecution and trial; (2) admitting into evidence a chart summarizing certain phone calls and events; and (3) sentencing him to a 25 year term under the Narcotics Penalties and Enforcement Act of 1986 (1986 Act), rather than the prior 1984 Act.

We affirm the conviction. We also affirm the district court's sentencing of Meyers under the increased penalty provisions of 21 U.S.C. § 841(b) as amended in the Narcotics Penalties and Enforcement Act of 1986. We conclude that the enhanced penalty provisions became effective immediately, on the date of enactment, October 27, 1986, and thus that the imposition of a 25 year term, as to this defendant whose underlying offense occurred after the effective date, was not error.

## BACKGROUND

On February 25, 1987, an indictment was filed against Franz Magdalener (Magdalener) charging him with several offenses including conspiracy to distribute cocaine in the State of Montana and elsewhere. Approximately one month later, a superseding indictment was filed charging Magdalener and ten other individuals, including Meyers, with conspiracy to distribute cocaine in Montana and elsewhere. In April 1987, Meyers turned himself in to the FBI office in West Palm Beach, Florida. Pursuant to the order of the Montana district court, Meyers was transported to Montana for his arraignment on May 1, 1987 where he entered a plea of not-guilty. All of the defendants charged in the indictment, with the exception of Meyers and Jay Pinder, entered into plea agreements with the United States. After a four day trial in June, the jury returned its verdict of guilty against Meyers and Pinder.

At trial, Magdalener testified that in 1985, he and Terry Norman Toepper (Toepper) discussed obtaining a large amount of marijuana for importation into the United States and later discussed obtaining marijuana as well as cocaine for the purpose of resale. Toepper was residing in Bozeman, Montana and Magdalener was in Florida.

In October of 1986, Toepper approached the FBI in Bozeman, Montana and advised them that he had information about individuals engaged in the transportation of cocaine from Florida to Montana. In cooperation with the FBI, Toepper agreed to wear a recording device and to record his phone calls. In December of 1986, Toepper traveled to Florida to obtain a kilo of cocaine and remained there for approximately a week.

On December 12, 1986, Rusty Ward, an indicted co-conspirator, arranged for Toepper to meet John DeCicco, another indicted

---

* Honorable Bruce R. Thompson, Senior United States District Judge for the District of Nevada, sitting by designation.

co-conspirator but fugitive as of this writing. After several attempts to contact individuals to obtain a kilo of cocaine, DeCicco and Toepper went to Jupiter, Florida, and met with appellant Meyers. After going to Meyers' house, Toepper, DeCicco and Meyers then proceeded to Davie, near Fort Lauderdale, to see "Mike," also known as Michael Miller.

When they arrived in Davie, Meyers left DeCicco and Toepper at a shopping center and went to a house belonging to Miller. Upon returning to the shopping center, Meyers advised that he had received a couple hundred dollars from Miller. The three men then headed back toward Jupiter, Florida. Prior to leaving Fort Lauderdale, Toepper was shown some samples of cocaine by DeCicco and, according to Toepper, DeCicco said that these came from Meyers. Upon returning to Jupiter, the three men went to Brian's Bar. DeCicco and Toepper then dropped Meyers off at his home and went to another bar, which Toepper described as the Apple Bar Lounge. Rusty Ward called Toepper at this bar and told him to come to the Inlet Bar. At the Inlet Bar, Toepper gave Rusty Ward the keys to his rental automobile. After being there a short while, Ward returned the keys to Toepper and told him the brief case with the kilo was outside in the car behind the bar. The kilo of cocaine was then recovered by the FBI upon Toepper's return to his hotel. It was Toepper's contention that this kilo was intended to be shipped to Montana.

## DISCUSSION

### I. *Motion to Transfer Place of Prosecution and Trial*

Meyers moved the district court, under Rules 18 and 21 of the Fed.R.Crim.P., to transfer the prosecution and trial against him to the appropriate United States District Court for the State of Florida on the grounds that (1) there was nothing to indicate his involvement in a conspiracy to distribute cocaine to Montana, and (2) his only overt acts, if any, occurred in Florida.

We review a ruling on a motion for change of venue for an abuse of discretion.

*United States v. Birges*, 723 F.2d 666, 674 (9th Cir.), *cert. denied*, 466 U.S. 943, 104 S.Ct. 1926, 80 L.Ed.2d 472 (1984).

■ Rule 18 provides, in part, that "the prosecution shall be had in a district in which the offense was committed." Fed.R. Crim.P. 18. So long as overt acts in furtherance of the conspiracy occurred within the State of Montana, venue was proper in that district. As we have consistently explained, "venue is appropriate in any district where an overt act committed in the course of the conspiracy occurred." *United States v. Schoor*, 597 F.2d 1303, 1308 (9th Cir.1979); *see also, United States v. Prueitt*, 540 F.2d 995, 1006 (9th Cir.1976), *cert. denied*, 429 U.S. 1063, 97 S.Ct. 790, 50 L.Ed.2d 780 (1977); *United States v. Barnard*, 490 F.2d 907, 910 (9th Cir.1973), *cert. denied*, 416 U.S. 959, 94 S.Ct. 1976, 40 L.Ed.2d 310 (1974). It is not necessary that Meyers himself have entered or otherwise committed an overt act within the district, as long as one of his co-conspirators did. *See United States v. Williams*, 536 F.2d 810, 812 (9th Cir.), *cert. denied*, 429 U.S. 839, 97 S.Ct. 110, 50 L.Ed.2d 106 (1976) (venue for conspiracy was proper in district in which appellant's co-conspirator committed overt act); *cf., United States v. Parrish*, 736 F.2d 152, 158 (5th Cir.1984) (venue of drug prosecution in Louisiana was proper, even as to defendant who was not shown to have ever been in Louisiana in furtherance of conspiracy). Thus, where at least two of Meyers' co-conspirators, Terry Toepper and Rusty Ward, committed numerous overt acts in Montana, venue was proper in that district.

### II. *Admission of Exhibit 15*

Meyers also argues the district court erred in admitting under Fed.R.Evid. 1006, exhibit 15, a chart summarizing the phone calls and events observed by surveillance teams on December 12, 1986.

This Court reviews a district court's evidentiary rulings for an abuse of discretion. *United States v. Gwaltney*, 790 F.2d 1378, 1382 (9th Cir.1986), *cert. denied*, —— U.S. ——, 107 S.Ct. 1337, 94 L.Ed.2d 187 (1987).

Even if error is found, nonconstitutional errors do not require reversal unless it is "more probable than not" that they affected the verdict. *United States v. Soulard*, 730 F.2d 1292, 1296 (9th Cir.1984); Fed.R. Crim.P. 52(a).

■ The proponent of a summary of "voluminous writings" under Fed.R.Evid. 1006 must, in this Circuit, establish that the underlying materials upon which the summary is based are admissible in evidence. *United States v. Johnson*, 594 F.2d 1253, 1255 (9th Cir.), *cert. denied*, 444 U.S. 964, 100 S.Ct. 451, 62 L.Ed.2d 376 (1979); *City of Phoenix v. Com/Systems, Inc.*, 706 F.2d 1033, 1038 (9th Cir.1983) (summary admissible only if underlying documents admissible, voluminous and available for inspection). Although the underlying materials must be "admissible," they need not be "admitted" in every case. *Johnson*, 594 F.2d at 1257, n. 6.

■ Exhibit 15 summarized (1) a record of long distance phone calls of various co-conspirators and (2) the surveillance logs of two FBI teams. At the time exhibit 15 was offered, the telephone logs had been admitted and FBI Special Agent Reid Robertson, head of the surveillance team of December 12, 1986 had fully testified. Later in the trial, Special Agent Gunnar Askeland, also a member of the surveillance team, testified and was cross-examined as to the contents of the chart and the matters observed on the day in question. The surveillance logs themselves had also been made available for inspection by the defense but were never formally admitted into evidence.

The surveillance reports, though not admitted, were admissible under the business record exception to the hearsay rule. Fed. R.Evid. 803(6). It is established that "entries in a police report which result from the officer's own observations and knowledge may be admitted, but that statements made by third persons under no business duty to report may not." *United States v. Pazsint*, 703 F.2d 420, 424 (9th Cir.1983). The fact that two surveillance teams were operating on December 12, 1986 does not alter the fact that *all* the officers would

have been "acting routinely, under a duty of accuracy, with employer reliance on the result." *Id.* (quoting *Clark v. City of Los Angeles*, 650 F.2d 1033, 1037 (9th Cir.1981), *cert. denied*, 456 U.S. 927, 102 S.Ct. 1974, 72 L.Ed.2d 443 (1982)). There is no evidence in the record indicating that the surveillance reports improperly incorporated the statements of third persons under no business duty to report. Thus, the *Johnson* test of underlying admissibility is satisfied in this case.

Further, the cross-examination of Agents Robertson and Askeland allowed the defendant to question fully two of the central participants on the surveillance team and thereby alert the jury to any alleged discrepancies in the chart. *See United States v. Poschwatta*, 829 F.2d 1477, 1481 (9th Cir.1987), *cert. denied*, —— U.S. ——, 108 S.Ct. 1024, 98 L.Ed.2d 989 (1988) (finding no abuse in admission of charts where underlying figures already admitted and opportunity to cross-examine witness provided). Finally, the sequence of events on the 12th of December was indeed confusing and the chart arguably contributed to the clarity of the presentation. *Id.; see also, United States v. Gardner*, 611 F.2d 770, 776 (9th Cir.1980).

III. *Sufficiency of the Evidence*

Meyers also argues the evidence was insufficient to sustain his conviction for conspiracy to distribute cocaine. At best, Meyers concedes, the evidence suggests that he may have been in possession of five samples of cocaine in Florida, but not in any event, that he made a knowing entry into a conspiracy to obtain cocaine for distribution in Montana.

In assessing the sufficiency of the evidence, our inquiry is whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *United States v. Calabrese*, 825 F.2d 1342, 1348 (9th Cir.1987).

■ The essential elements of a conspiracy are (1) an agreement to engage in

criminal activity, (2) one or more overt acts taken to implement the agreement, and (3) the requisite intent to commit the substantive crime. *United States v. Indelicato*, 800 F.2d 1482, 1483 (9th Cir.1986) (per curiam). Once the existence of the conspiracy is shown, evidence establishing beyond a reasonable doubt a knowing connection of the defendant with the conspiracy, even though the connection is slight, is sufficient to convict him of knowing participation in the conspiracy. *United States v. Fleishman*, 684 F.2d 1329, 1340–41 (9th Cir.), *cert. denied*, 459 U.S. 1044, 103 S.Ct. 464, 74 L.Ed.2d 614 (1982). However, the connection to the conspiracy must be shown to be "knowledgeable"; that is, "the government must prove beyond a reasonable doubt that the defendant knew of his connection to the *charged* conspiracy." *United States v. Federico*, 658 F.2d 1337, 1344 (9th Cir.1981), *rejected on other grounds*, *United States v. DeBright*, 730 F.2d 1255 (9th Cir.1984) (en banc) (emphasis added).

█ The evidence against Meyers, though not overwhelming, is sufficient to support the conviction. The United States established the existence of a conspiracy between Terry Toepper, Franz Magdalener, Rusty Ward and others [1], as set out in the indictment, to "[f]ind sources of controlled substances, including marijuana and cocaine"; "[s]ecure buyers ... in Montana and elsewhere"; "[t]ransport ... to Montana and elsewhere"; and "distribute" said substances for profit. To sustain the conviction against Meyers, the evidence must show a knowing connection to that conspiracy, however slight. The testimony of Toepper and the tape recordings of conversations held between Toepper, DeCicco and Meyers on December 12, 1986 support the jury's finding that Meyer knowingly took part in the conspiracy to distribute cocaine, and in particular, in the effort to "find sources."

The Toepper testimony and recordings established that on December 12, 1986, after several attempts to contact individuals to obtain a kilo of cocaine, DeCicco and Toepper met with Meyers in Jupiter, Florida. It was DeCicco's impression that Tony [Meyers], who "knows more people than I do", would "know how to get a hold of Mike." The three men proceeded to Davie, in the area of Fort Lauderdale, to see "Mike," a.k.a. Michael Miller. Meyers left DeCicco and Toepper for approximately an hour, went to Miller's house, and returned with some samples of cocaine. According to Toepper's testimony, Meyers "came back and said that he couldn't get it right then, but he could get it at six o'clock that evening." The three men returned to Jupiter and went to Brian's Bar. DeCicco and Toepper then dropped Meyers off at his home and went to another bar in Jupiter, the Apple Bar Lounge. At the Apple Bar, DeCicco placed some calls, at least one, he told Toepper, to Meyers. Rusty Ward then called Toepper at the Apple Bar and told him to come to the Inlet Bar, where the cocaine transaction closed.

The tape recordings indicate that Meyers was an important connection for Toepper and Magdalener to Miller, a cocaine supplier, if not the supplier in this case. Meyers clearly understood that Toepper, Ward and DeCicco were seeking to purchase one kilo of cocaine, assisted these men in establishing a link to a known supplier, and transferred samples of cocaine to DeCicco and Toepper prior to the closing of the deal. These facts establish more than an "unwitting" connection to the scheme to distribute cocaine.

The evidence on whether or not Meyers knew the cocaine was destined specifically for Montana is conflicting. Nonetheless, we note that the indictment itself did not charge a conspiracy to distribute in Montana exclusively; rather it stated "in Montana and elsewhere." In addition, under the relevant standard of review, "[a]ll reasonable inferences from the evidence must be drawn in favor of the government." *Federico*, 658 F.2d at 1343. Toepper testified that during the drive from Jupiter to

---

**1.** The testimony of Magdalener implicated Dan Hellios, John McElvy, Kathy Polejewski, Harold Livingston, David McElvy and Jeff Sailors.

Davie, Meyers, DeCicco and he discussed that he was from Montana. The jury was entitled to believe or disbelieve this testimony. *See, e.g., United States v. Larm,* 824 F.2d 780, 783 (9th Cir.1987), *cert. denied,* —— U.S. ——, 108 S.Ct. 1057, 98 L.Ed.2d 1019 (1988). Although the transcripts of the tapes do not record Toepper's mentioning of Montana to Meyers, they clearly record such statements to DeCicco on at least two instances.

Finally, given the substantial quantity of cocaine involved in this case, the jury could also reasonably conclude that Meyers knew that such a narcotic, in such an amount, was not likely to stay in Florida and was destined for redistribution elsewhere. *See, e.g., United States v. Smith,* 609 F.2d 1294, 1300 (9th Cir.1979) (jury could conclude defendants knew that drugs are frequently dispensed through a network of suppliers, wholesalers, and retailers in different states); *see also, United States v. Smith,* 832 F.2d 1167 (9th Cir.1987) (quantity may be sufficient for jury to infer intent to redistribute). In sum, we conclude slight but sufficient evidence linked Meyers to the conspiracy.

IV. *Sentencing*

A. Effective Date of 1986 Act

 Meyers also challenges the district court's imposition of a 25 year sentence under the enhanced penalty provisions of the Narcotics Penalties and Enforcement Act of 1986, Pub.L. No. 99–570, 100 Stat. 3207, 3207–2 to 3207–8 (1986) ("1986 Act").[2] *See* 21 U.S.C. § 841(b) (Supp.IV 1986). Meyers contends the penalty provisions of the Controlled Substances Penalties Amendments Act, Pub.L. No. 98–473, 98 Stat. 2030 (1984) ("1984 Act"), in fact apply in this case. 21 U.S.C. § 841(b) (Supp. II 1984). Alternately, Meyers argues neither the 1984 nor the 1986 amendments to the penalty provisions apply because both amendments were tied to the effective date

set out in section 235 of the Sentencing Reform Act of 1984, November 1, 1987. Following review of the relevant legislation, we conclude the most rational construction of the statutory scheme is that the increased penalty provisions of the 1986 Act became effective immediately on October 27, 1986. Thus, Meyers was correctly sentenced on July 24, 1987 to 25 years under the 1986 Act.

Prior to 1984, the penalty provisions of 21 U.S.C. § 841 for violations involving narcotic drugs, provided for a term of imprisonment of not more than 15 years, a fine of not more than $25,000, or both. 21 U.S.C. § 841(b)(1)(A) (1982). In 1984, Congress amended the penalty provisions of 21 U.S. C. § 841 in the Controlled Substances Penalties Amendments Act. *See* Pub.L. 98–473, 98 Stat. 2068–69, § 501 *et seq.* (1984); 21 U.S.C. § 841(b)(Supp. II 1984). For violations of section 841(a) involving, as in the instant case, a kilogram or more of a narcotic drug, the statute provided that "such person shall be sentenced to a term of imprisonment of not more than 20 years, a fine of not more than $250,000, or both." Pub.L. 98–473, 98 Stat. 2068, § 502 (1984). The increased penalty provisions of the 1984 Act became effective upon their enactment on October 12, 1984. *Calabrese,* 825 F.2d at 1346; *cf., United States v. Shaffer,* 789 F.2d 682 (9th Cir.1986) (provision granting government right to appeal under Comprehensive Crime Control Act of 1984 effective as of enactment on October 12, 1984).

In 1986, the penalty provisions were amended again, in the Narcotics Penalties and Enforcement Act of 1986, part of the comprehensive Anti–Drug Abuse Act of 1986. Pub.L. 99–570, 100 Stat. 3207, § 1001 et seq. (1986); 21 U.S.C. § 841(b) (Supp. IV 1986). Section 841(b) was amended to provide that in the case of violations involving 500 grams or more of a mixture containing cocaine, "such person shall be sentenced to a term of imprison-

---

**2.** The district court originally sentenced Meyers on July 24, 1987 to 25 years with a special parole term of 4 years to follow. Subsequently, on September 16, 1987, the court, under Fed.R. Crim.P. 35(a), amended its judgment to delete the imposition of the 4 year special parole term. Accordingly, any questions regarding the application of the special parole or supervised release provisions are not before us in this appeal.

ment which may not be less than 5 years and not more than 40 years ... a fine not to exceed ... $2,000,000 if the defendant is an individual ... or both." Pub.L. 99–570, 100 Stat. 3207, 3207–3 to 3207–4 § 1002 (1986); 21 U.S.C. § 841(b)(1)(B) (Supp. IV 1986).

Meyers argues that the 1986 amendments to the penalty provisions did not become effective immediately upon the statute's enactment on October 27, 1986, but rather that the amendments were tied to certain provisions of the 1986 Act delaying the effective date to November 1, 1987. Specifically, Meyers notes the following section:

> The amendments made by this section shall take effect on the date of the taking effect of section 3583 of Title 18, United States Code. [November 1, 1987]. Narcotics Penalties and Enforcement Act of 1986, Pub.L. 99–570, § 1004(b), 100 Stat. 3207–6.

The district court concluded that the reference to "this section" in the above quotation only referred to section 1004 of the 1986 Act which amended the Controlled Substances Act and the Controlled Substances Import and Export Act by striking the term "special parole term" and inserting "term of supervised release." The district court found the effective date of the enhanced sentencing provisions was not tied to 18 U.S.C. § 3583 and that only the amendments to the special parole provisions were delayed to 1987.

We agree with this construction of the statute. The only specific mention of a delayed effective date occurs in those sections modifying or eliminating special parole terms or "terms of supervised release," *see, e.g.,* Pub.L. 99–570, §§ 1004(b),

1006(a)(4), or those sections requiring application of the guidelines issued by the Sentencing Commission, such as those provisions providing for a court's limited authority to impose a sentence below a statutory minimum, see Pub.L. 99–570, § 1007(b), § 1009(b). The lengthy sections amending the penalty provisions of 21 U.S.C. § 841(b) make no mention of a delayed effective date. *See* Pub.L. 99–570, §§ 1002, 1003. Under general principles of statutory construction, "[i]n the absence of an express provision in the statute itself, an act takes effect on the date of its enactment." *Shaffer,* 789 F.2d at 686 (quoting cases). This date would be, as the government contended below, October 27, 1986, the date of the Act's approval by the President.[3]

▮ At oral argument, we requested the parties to address the applicability, if any, of the provisions and effective date of the Sentencing Reform Act of 1984, Pub.L. 98–473, 98 Stat. 2030–31, § 235(b)(1)(1984) and a recent decision of this Court construing that Act, *United States v. Rewald,* 835 F.2d 215, 216 (9th Cir.1987). *Rewald* indicated the Sentencing Reform Act of 1984 became effective on November 1, 1987 and that the sentencing guidelines developed by the Sentencing Commission do not apply to conduct that occurred prior to November 1, 1987.[4] In this case, our inquiry was directed to the question of whether the effective date set out in section 235 of the Sentencing Reform Act of 1984 also operated to delay the effective date of the 1986 amendments to the penalty provisions of 21 U.S. C. § 841(b). We conclude it does not.

Section 235 of the Sentencing Reform Act of 1984 was enacted in Chapter II of the Comprehensive Crime Control Act of 1984. Pub.L. 98–473, 98 Stat. 1837 (1984).[5]

---

3. Although no circuit court has squarely confronted the question of when the enhanced penalty provisions of § 841(b)(1) of the 1986 Act became effective, one district court, in upholding the constitutionality of the penalty provisions, assumed the amendments became effective on October 27, 1986. *See United States v. Restrepo,* 676 F.Supp. 368, 378 (D.Mass.1987).

4. Rewald's appeal was dismissed for lack of jurisdiction. We found that since Rewald had been sentenced approximately two years prior

to the effective date of the Sentencing Reform Act of 1984, and since that Act does not apply to conduct committed prior to November 1, 1987, the Court lacked jurisdiction to hear the appeal. *See Rewald,* 835 F.2d at 216.

5. The Comprehensive Crime Control Act of 1984 contained a total of 23 chapters. *See* A. Patridge, The Crime Control and Fine Enforcement Acts of 1984: A Synopsis (Federal Judicial Center 1985).

Chapter II made substantial amendments to the general sentencing provisions of the United States Code, 18 U.S.C. § 3551 *et seq.*, and also, *inter alia*, provided for the establishment of the United States Sentencing Commission. *See* Sentencing Reform Act of 1984, Pub.L. 98–473, 98 Stat. 1987, 2017. Section 235 of Chapter II provides that "[t]his chapter shall take effect on the first day of the first calendar month beginning twenty-four months after the date of enactment ..." Sentencing Reform Act of 1984, Pub.L. 98–473, 98 Stat. 2031, § 235(a)(1). Congress subsequently extended the effective date by 12 months. *See* 18 U.S.C. § 3551 (Supp. IV 1986) (chapter effective 36 months after enactment). Thus, it is clear the changes enacted by Sentencing Reform Act of 1984, and in particular, the sentencing guidelines and policy recommendations of the United States Sentencing Commission, took effect November 1, 1987. *Id.; see also, Rewald,* 835 F.2d at 216.

The 1984 amendments to the penalty provisions of 21 U.S.C. § 841, however, fall within an entirely different chapter, Chapter V of the Comprehensive Crime Control Act of 1984. Pub.L. 98–473, 98 Stat. 2068, § 501 *et seq.* Consequently, Meyers errs when he contends the effective date set out in Chapter II of the Sentencing Reform Act controls the application of the amendments set forth in Chapter V of the Controlled Substances Penalties Amendments Act of 1984. As we stated in *Calabrese,* the increased penalties of the 1984 Act became effective immediately on October 12, 1984. *Calabrese,* 825 F.2d at 1345–46. Given that the 1984 amendments to the penalty provisions were not tied to the effective date of the Sentencing Reform Act, there is little reason to find that the 1986 amendments were so tied. This is especially true where, as noted above, the only specific mention of a delayed effective date in the 1986 Act occurs in those provisions relating to special parole or the application of the sentencing guidelines. Accordingly, we hold the 1986 amendments to the penalty provisions of 21 U.S.C. § 841, as provided in the Narcotics Penalties and Enforcement

Act of 1986, became effective immediately on October 27, 1986.

## B. Disparate Sentencing

■ Finally, Meyers argues that even if he was properly sentenced under the 1986 Act, his sentence of 25 years was improper because excessively disparate from the sentences imposed on other defendants. We review a district court's sentencing decision for an abuse of discretion. *United States v. Messer,* 785 F.2d 832, 834 (9th Cir.1986). A sentence which falls within statutory limits is ordinarily not reviewable unless there exist constitutional concerns. *United States v. Tucker,* 404 U.S. 443, 446–47, 92 S.Ct. 589, 591, 30 L.Ed.2d 592 (1972); *Messer,* 785 F.2d at 834. Disparate sentences alone normally do not constitute an abuse of discretion. *United States v. Endicott,* 803 F.2d 506, 510 (9th Cir.1986).

■ However, Meyers also contends that the court imposed a more severe sentence because he exercised his constitutional right to stand trial. This argument has no support in the record. To the contrary, the district court specifically assured defense counsel that the sentence would not be enhanced because Meyers went to trial. The court also explained that in imposing the sentence, it had taken Meyers' prior record into account, as well as his actions in this case. On the facts presented, and given our finding that Meyers was properly sentenced under the 1986 Act, there was no abuse of discretion such as that demonstrated in *United States v. Medina–Cervantes,* 690 F.2d 715, 716 (9th Cir.1982). *See also, United States v. Carter,* 804 F.2d 508, 513 (9th Cir.1986). Accordingly, we find no abuse of discretion in the imposition of a 25–year sentence.

## CONCLUSION

We conclude the evidence against Meyers was sufficient to establish a knowing connection to a conspiracy to distribute cocaine "in Montana and elsewhere," and thus affirm the conviction.

We also uphold Meyers' sentencing under the enhanced penalty provisions of the 1986 Act because those provisions became

effective on October 27, 1986. Given the permissible range of sentences under the 1986 Act, the imposition of a 25 year term did not constitute an abuse of discretion.

AFFIRMED.