UNITED STATES of America,
Plaintiff–Appellee,

v.

Daniel Gregory ROSEN, Defendant—
Appellant.

United States of America,
PlaintiffAppellee,

v.

Manuel Erazo Galdamez, Defendant—
Appellant.

United States of America,
Plaintiff—Appellee,

v.

Ayman Helmi Mansour, aka Andy;
Dan, Defendant—Appellant.

United States of America,
Plaintiff—Appellee,

v.

Helmi Zaky Mansour, aka John S. Manson; Jhon Carigab; Hamdy M. Serour, Defendant—Appellant.

No. 00–10515, 01–10006.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted March 8, 2004.

Decided April 5, 2004.

Samantha Sue Spangler, USSC–Office of the U.S. Attorney, Sacramento, CA, for Plaintiff–Appellee.

Mary McNamara, Swanson and McNamara LLP, San Francisco, CA, for Defendant–Appellant.

Before: FERNANDEZ, HAWKINS and THOMAS, Circuit Judges.

## MEMORANDUM *

Defendants Dan Rosen, Helmi Mansour, and Ayman Mansour appeal their jury convictions and sentences for conspiracy to distribute listed chemicals (pseudoephedrine), conspiracy to launder money and money laundering, conspiracy to structure monetary instruments to evade reporting requirements, engaging in monetary transactions in property from specified unlawful activity, and criminal forfeiture. Manuel Galdamez appeals his jury conviction and sentence for conspiracy to structure monetary instruments. We affirm. Because the parties are familiar with the factual and procedural history of this case, we will not recount it here.

### I

■ The district court did not commit plain error in instructing the jury on the scienter element of conspiracy to distribute listed chemicals. The court correctly set forth the correct basic statutory standard of "knowledge or reasonable cause to believe." We review the instruction for plain error, which is an error that is both plain and which affects substantial rights. *United States v. Olano*, 507 U.S. 725, 732, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993). However, even if the record indicates a district court committed plain error, the decision to correct the error remains "within the sound discretion of the court of appeals, and the court should not exercise that discretion unless the error 'seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.'" *Id.* In addition, we note that "an improper instruction rarely justifies a finding of

plain error." *United States v. Still*, 857 F.2d 671, 671 (9th Cir.1988) (quoting *United States v. Glickman*, 604 F.2d 625, 632 (9th Cir.1979)).

In this case, the giving of the instruction was not plain error because it mirrored the statutory language. *Henderson v. Kibbe*, 431 U.S. 145, 154, 97 S.Ct. 1730, 52 L.Ed.2d 203 (1977). Further, counsel's belated attack on the instruction before us is really a thinly-veiled assault on the constitutionality of the statute—an issue that was not raised by counsel and is not before us. Finally, counsel for both sides argued largely similar theories of the standard, and the criminal conduct charged was neither enlarged by the suggestion of a mere negligence standard, nor diminished by the suggestion of a standard of intent, design, or purpose. Under the circumstances, we see no plain error in the trial court's instruction.

### II

■ The district court did not plainly err in instructing the jury on conspiracy to structure monetary transactions by failing to define "currency transactions" *sua sponte*. Defendants argue that the district court should have made clear to the jury that former 31 C.F.R. § 103.11(ii)(2) covers only physical transfers of actual cash currency, and that defendants could be convicted on this count only if they purchased cashier's checks in amounts under $10,000 and not if they just deposited cashier's checks of amounts under $10,000. Defendants did not object to the instruction at trial; therefore, we review this claim for plain error. *Olano*, 507 U.S. at 732, 113 S.Ct. 1770.

Taken in context, the instruction was not misleading. While "transactions in cur-

---

\* This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by Ninth Circuit Rule 36–3.

rency" taken alone might be considered vague, the instruction specifically referenced "cash transactions." It is doubtful that jurors would think that a deposit of a check in a bank account would properly be considered a "cash transaction."

Furthermore, as argued by the government, the jurors also heard expert testimony explaining that financial institutions must file a currency transaction report for "[a]ny currency transaction in excess of $10,000," and that the reporting requirement was triggered by cash transactions over $10,000. The government also focused throughout the trial on the fact, charged in the indictment, that, in July and September of 1997, Rosen wrote Verdi notes giving him directions to purchase cashier's checks, each under $10,000 in amount, in order to pay for the pseudoephedrine shipments. Thus, the jury instruction, taken in this context, was unlikely to lead the jurors to convict on this ground on the basis of bank deposits of cashier's checks.

The instruction, taken in the context of all the trial testimony, was likely clear to the jury, and any lack of clarity did not affect substantial rights or amount to plain error, as all appellants had made purchases and deposits of cashier's checks with the intent to cause a financial institution to evade reporting requirements.

### III

■ Sufficient evidence supports Galdamez's conviction on the structuring conspiracy. There is insufficient evidence to support a conviction if, viewing the evidence in the light most favorable to the prosecution, no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

■ Galdamez argues that there was no evidence that he knew of Appellants' underlying objective to illegally purchase and distribute pseudoephedrine with the cashier's checks he sold Zhili and Celis, and that the government thus failed to demonstrate he had the requisite intent to commit the underlying offense. However, a conviction for conspiracy to structure monetary instruments does not require a showing that the defendant shared the objective the co-conspirators had regarding the ultimate use of the structured funds; the statute requires only that the defendant share the purpose of causing a financial institution to evade reporting requirements. *See* 31 U.S.C. §§ 5313(a), 5325.

A rational jury could have found on the basis of the evidence presented beyond a reasonable doubt that: (1) Galdamez agreed to engage in the criminal activity of structuring monetary instruments; (2) that he engaged in numerous overt acts in order to implement the agreement; and (3) that he had the requisite intent to commit the substantive crime of structuring monetary instruments. *See United States v. Meyers*, 847 F.2d 1408, 1412–13 (9th Cir.1988). Thus, Galdamez's sufficiency claim fails.

### IV

Although we are greatly troubled by the government's conduct in this case, we ultimately conclude that the district court did not err in limiting disclosure of one government witness's impeachment material in order to protect ongoing investigations.

During trial, the government provided the district court with various materials containing redacted interviews with the government's cooperating witness David Verdi for *in camera* review, in order to assess the defense's contention that these materials contained Jencks Act statements, *Brady* material, or *Giglio* material.

*See* 18 U.S.C. § 3500; *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); *Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). The defense contended that disclosure of this redacted material was necessary to protect defendants' Sixth Amendment rights to confrontation, as well as their Fifth Amendment rights to due process, as the interviews contained information impeaching Verdi and exculpating Appellants. The government claimed that disclosure of the redacted material would compromise ongoing investigations and endanger the safety of certain investigating agents. The government thus argued that its interest in keeping this material secret should be deemed to outweigh the defense's interest in any impeachment material contained therein, as any such material was cumulative of impeachment evidence already in their possession.

■ The district court assessed the redacted and unredacted versions of the interviews and witness statements in question *in camera,* and the court decided that the material was in fact cumulative, that it was not material given the amount of other impeachment material in the possession of the defense, and that the government thus need not disclose the redacted materials. The district court's *in camera* review of the documents was proper under the Jencks Act. 18 U.S.C. § 3500. We conclude there was no Jencks Act violation.

■ In order to succeed on their *Brady* claim, defendants must show: (1) that the evidence at issue is favorable to them, and is either exculpatory or impeachment material; (2) that the evidence was suppressed by the State, either willfully or inadvertently; and (3) that prejudice results from the failure to disclose the evidence. *See United States v. Bagley,* 473 U.S. 667, 676, 678, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985); *see also United States v. Agurs,* 427 U.S. 97, 110, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976). Evidence will be considered prejudicial or "material" only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. *Bagley,* 473 U.S. at 682, 105 S.Ct. 3375. A "reasonable probability" is a probability "sufficient to undermine confidence in the outcome." *Id.* For purposes of determining materiality, the withheld evidence must be analyzed "in the context of the entire record." *Agurs,* 427 U.S. at 112, 96 S.Ct. 2392. We will not automatically require a new trial unless the disclosed evidence is "likely to have changed the verdict...." *Giglio,* 405 U.S. at 154, 92 S.Ct. 763.

In *Carriger v. Stewart,* 132 F.3d 463, 479 (9th Cir.1997) (en banc), we made it quite clear that "material" evidence includes evidence relevant to the credibility of government witnesses. Indeed, we cautioned that impeaching or exculpating disclosure must be given special scrutiny where a cooperating witness has been rewarded by the government for his testimony, as Verdi was here. *Id.* Verdi testified at trial that he agreed to cooperate with the government in order to avoid a possible life sentence for his extensive criminal actions. Such a cooperating witness is:

> [b]y definition ... cut from untrustworthy cloth[,] and must be managed and carefully watched by the government and the courts to prevent them from falsely accusing the innocent, from manufacturing evidence against those under suspicion of crime, and from lying under oath in the courtroom.... Because the government decides whether and when to use such witnesses, and what, if anything, to give them for their service, the government stands uniquely positioned to guard against perfidy.... Accordingly, we expect prosecutors and investi-

gators to take all reasonable measures to safeguard the system against treachery. This responsibility includes the duty as required by *Giglio* to turn over to the defense in discovery all material information casting a shadow on a government witness's credibility.

*Id.* (quoting *United States v. Bernal–Obeso*, 989 F.2d 331, 333–34 (9th Cir.1993)).

Here, the redacted materials did concern other suspects in other investigations, including a source Verdi purportedly had in the DEA; it also dealt with overseas operations. Defendants argue that this information shows that Verdi was an international dealer in illicit substances, and that he was clearly the mastermind of the entire operation in the southwestern United States. Defendants urge that the evidence would have shown the sophistication of the witness in duping persons such as the defendants. They also contend that it would have shown the magnitude of prison time facing Verdi if he had not cooperated.

Taking the redacted evidence as a whole, it is clear that it is both exculpatory material and impeachment material. *See Bagley*, 473 U.S. at 676, 105 S.Ct. 3375. It is also clear that the government intentionally suppressed the material. Its excuse was that the material would compromise other investigations; however, a review of the material does not completely support this contention. We hold that the government violated its *Brady* obligations by not disclosing the information prior to trial.

The question of materiality in the *Brady* context is another matter. The jury had already heard Verdi testify at trial that his lawyer had told him he was facing a possible life sentence for his crimes, so it is doubtful that a few more details of his international operations would further impeach him in this regard. *See United States v. Vgeri*, 51 F.3d 876, 880 (9th Cir. 1995) (undisclosed impeachment evidence

immaterial and cumulative when witness is already sufficiently impeached). Evidence that Verdi was the "mastermind" of the operation also does not undermine, for instance, the trial evidence that the DEA seized a note from Rosen directing payment from Verdi for the next shipment in 10 cashier's checks for $9,900 each.

Similarly, more evidence that Verdi was a sophisticated and accomplished criminal than that which was already presented at trial would do little to exculpate the Mansours on the theory that they were merely Verdi's "dupes." The jury had heard testimony that Mansours received "Red Notices" from the DEA; that they both purchased structured cashier's checks which were deposited by Rosen; that Helmi Mansour was warned not to work with Verdi by Agent Puralewski after the controlled delivery of pseudoephedrine; that Helmi used the aliases Hamdi Serour, John S. Manson, and Jhon Carigab; that Helmi told El Hajjaoui he was "proud" he had never been stopped by the DEA or Highway Patrol while making a delivery; that Helmi Mansour used different fake ID's for each pickup at Hajjaoui's Vegas location; that Helmi Mansour told Hajjaoui that he hid pseudoephedrine in shoe boxes during shipments; and that he circumvented agricultural checkpoints to avoid inspection, etc.

It is true that the state cannot avoid a *Brady* violation simply by providing some exculpatory evidence and then asserting that the rest is cumulative. *See Benn v. Lambert*, 283 F.3d 1040, 1054–56 (9th Cir. 2002). Nevertheless, where the evidence does not undermine confidence in the outcome of the trial "in the context of the entire record," due process does not mandate reversal. *See Agurs*, 427 U.S. at 109–10, 112, 96 S.Ct. 2392.

Thus, even if Verdi's testimony were thoroughly impeached, the jury would still

be left with the fact that "dupes" who believe they are distributing vitamins have no need of aliases, nor any need of structured cashier's checks—nor do dupes feel the need to circumvent agriculture checkpoints or evade the DEA or the CHP. The jury would also still have before it undisputed evidence that the Rosens and Mansours trafficked in thousands of kilograms of pseudoephedrine—a quantity hundreds of times the 20 kg minimum required to reach the top of the federal listed chemical sentencing guideline (level 30), and that they did this after having received numerous warnings about methamphetamine diversion from the DEA. The jury would have before it evidence that Rosen was informed by authorities that the average retail store sells approximately one case of pseudoephedrine a month, whereas he was selling thousands of cases per month to the same businesses. The jury would further have before it the undisputed fact that this distribution scheme went hand-in-hand with a scheme to launder funds and structure monetary instruments in near-uniform denominations, so as to cause banks to evade reporting requirements.

Thus, although the materiality of the redacted evidence is an extremely close question in this case, we ultimately conclude that it does not warrant reversal under the unique circumstances present here. Nonetheless, we take the occasion to remind the United States Attorney's office of its special obligation. Late disclosures of *Brady* material, particularly during trial, are an anathema to the principles underlying our criminal justice system. These concerns are outside our legal review of this case, however, and we trust that these matters will be reviewed appropriately by the Department of Justice in its usual review of such situations.

## V

■ The alleged ineffectiveness of a co-defendant's attorney during plea bargaining on a package deal did not violate Rosen's due process rights. We have only entertained vicarious ineffective assistance of counsel claims in very narrow circumstances. *See, e.g., United States v. Bradford*, 528 F.2d 899 (9th Cir.1975). Indeed, we have criticized the theory of communal criminal representation. *Delgado v. Lewis*, 223 F.3d 976, 981 (9th Cir.2000) (noting the inherent conflicts of interest among defense counsel in a multi-defendant criminal conspiracy case).

Here, Rosen had no general right to a plea bargain in the first instance. *See U.S. v. Wheat*, 813 F.2d 1399, 1405 (9th Cir.1987). Thus, his constitutional rights were not violated by the actions of co-defense counsel in plea negotiations for his client.

## VI

■ We lack jurisdiction to consider Rosen's argument that the district court erred by denying Rosen's request for a sentencing disparity downward departure based on the ineffectiveness of his co-defendant's counsel. Contrary to Rosen's assertions, the district court recognized its discretion to grant a downward departure, stating: "I do not think this is a case in which I should exercise my discretion to downwardly depart." Thus, this is not a case in which the district court failed to recognize its authority, and we lack appellate jurisdiction to review the trial court's discretionary decision. *United States v. Lipman*, 133 F.3d 726, 729 (9th Cir.1998).

AFFIRMED.