UNITED STATES of America, Plaintiff–Appellee,

v.

Sam PAIZ, Douglas Rector, Dick Selby, Leann Cooper, Joe Rector, Barbara Allen, and Tim Rector, Defendants–Appellants.

Nos. 89–1264, 89–1282, 89–1285, 89–1304, 89–1307, 89–1308 and 89–1315.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 15, 1990.

Decided June 6, 1990.

As Modified June 21, 1990.

---

1. *See also Boyde v. California,* 495 U.S. ——, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990).

Andrew B. Baker, Jr., Asst. U.S. Atty., Hammond, Ind., for U.S.

Sean T. Maloney, Chapman & Cutler, Chicago, Ill., for Sam Paiz.

John L. Kelly, Jr., Vegter, Fisher, Kelly & O'Toole, Merrillville, Ind., for Douglas Rector.

David L. Chidester, Valparaiso, Ind., for Dick Selby.

Charles W. Lahey, South Bend, Ind., for Leann Cooper.

Clifford L. Davis, Tallahasse, Fla., for Joe Rector.

Donald W. Pagos, Sweeney, Dabagia, Donaghue & Thorne, Michigan City, Ind., for Barbara Allen.

Clyde M. Taylor, Jr., Tallahasse, Fla., for Tim Rector.

Before CUMMINGS and CUDAHY, Circuit Judges, and ESCHBACH, Senior Circuit Judge.

ESCHBACH, Senior Circuit Judge.

Joe Rector and his sons Ron, Doug, and Tim were drug dealers. They obtained drugs in Indiana and Nebraska, then shipped them "downstream" to Florida or New York where they moved the drugs to others in the drug-distribution pipeline. This group, Rector & Sons,[1] was caught. Joe, Doug, Tim, and a host of others who worked from time to time with Rector & Sons were prosecuted in federal court, convicted there, and sentenced. This consolidated criminal appeal involves a number of issues raised by some of these persons, individually or *en masse*, with respect to happenings below.

## I.

The Rectors were in the marijuana business. In July 1983, Doug Rector and others picked marijuana in Indiana and drove it down to Florida. In October 1983, Joe Rector, Doug Rector, and others went to Nebraska to pick marijuana. After a plentiful harvest, things went awry; police seized the gathered marijuana, arresting Joe and Doug. Despite this setback, the Rectors' drug-dealing ambitions remained high. Business continued. From 1983 to 1985 Tim Rector bought marijuana from Indiana suppliers and drove or had it shipped to him in Florida. Some of the marijuana obtained by these suppliers was from Sam Paiz, who had picked it in Nebraska. Though the business was good, relationships between the distributors were not always cordial. This is evidenced by an argument Paiz had with some Indiana suppliers over wet marijuana, an argument observed by Joe Rector.

In 1984 the Rectors suffered another setback. One of Tim Rector's Indiana suppliers shipped some marijuana to Doug Rector's house in Florida. The police seized it there, and Doug Rector was arrested, convicted, and incarcerated. His absence from the business left a void, but it was soon filled by brothers Tim and Ron. They expanded the presence of their network: Tim found new markets in Florida; Ron, with the help of Paiz, secured new sources of supply in Indiana.

In January 1986, Doug was released from jail. Upon his return to Rector & Sons, business boomed. Doug secured a new customer in New York, Edguardo Velez, and shipped him marijuana he obtained in Indiana from Paiz and brother Ron. Velez also made occasional trips to Florida. On one trip he obtained a "load" of marijuana, about 200 pounds, from Joe Rector. Business was good for the Rectors and good for Velez, but, again, relationships were not always cordial. At one meeting among Velez, Joe, Doug, and Tim, Joe told Velez, "Make sure that you don't say anything about [the marijuana deals] because you will look funny in a pine box." And, as always, the business suffered setbacks: one of Doug's transporters, for example, was twice arrested—once in Pennsylvania, once in New Jersey—while running marijuana to New York.

As the volume of deals grew, bottlenecks developed in the supply end of the business, particularly in the transport phase.

---

1. We use the term "Rector & Sons" only as a convenient referent. Its employment should not be thought to imply a begging of this appeal's issues, particularly that of multiple conspiracies vs. single conspiracy.

Thus, Ron Rector had persons recruited to drive marijuana from Indiana to Florida (where the marijuana could be distributed in South Florida or reshipped to New York). Many persons became involved as drivers or drivers' chaperons for Ron or brother Tim. Sam Paiz was one of them. Barbara Allen, Leann Cooper, and Dick Selby were others. Allen, Cooper, and Selby also transported marijuana from Nebraska to Florida.

The supply bottlenecks were overcome, and 1986 was a banner year for Rector & Sons. Ron secured marijuana in Indiana and Nebraska, Doug sold it in Florida and elsewhere. Tim did a little of both. Joe handled finances. Paiz was involved in transport, as were Allen, Cooper, and Selby. The scheme generated lots of cash and benefits for everyone.

The good times continued until the spring of 1987. The last known transaction was a March 1987 shipment of marijuana from Ron in Indiana to Doug in New York.

## II.

On May 12, 1988, a grand jury returned an indictment against 36 defendants. On October 13, 1988, the indictment was superseded, a new 38 count indictment issuing against 20 defendants. Among those 20 were the appellants: Sam Paiz, Doug Rector, Dick Selby, Leann Cooper, Joe Rector, Barbara Allen, and Tim Rector. All of them were charged, in Count 3, with conspiracy to distribute and to possess with intent to distribute marijuana, in violation of 21 U.S.C. § 846. Sam Paiz also was charged with six counts of possession of over 50 kilograms of marijuana with intent to distribute it, in violation of 21 U.S.C. § 841(a)(1). Doug Rector similarly was charged with nine counts of possession. He also was charged with four counts of travel in interstate commerce to facilitate the unlawful distribution of marijuana, in violation of 18 U.S.C. § 1952(a)(3). Dick Selby was charged additionally with one count of violating 21 U.S.C. § 841(a)(1) and one count of violating 18 U.S.C. § 1952(a)(3). Tim Rector, in addition to being charged with conspiracy, was charged with six counts of 21 U.S.C. § 841(a)(1) violations involving marijuana (five involving over 50 kilograms of marijuana, one involving a lesser amount), two counts of 21 U.S.C. § 841(a)(1) violations involving cocaine, and six counts 18 U.S.C. § 1952(a)(3) violations. The appellants were arraigned. They entered pleas of not guilty.

On November 29, 1988, trial by jury began. On December 22, 1988, the jury returned its verdict. It found all of the appellants guilty of violating 21 U.S.C. § 846, as charged in Count 3. It also found Sam Paiz guilty of five of his possession counts, Doug Rector guilty of seven of his possession counts and all four of his Travel Act counts, Tim Rector guilty of five of his marijuana possession counts (four involving over 50 kilograms of marijuana, one involving less), but not guilty of his other counts, and Dick Selby not guilty of his possession counts. Motions for judgment of acquittal were made and denied.

We now face a flood of issues concerning these convictions. We address only those with arguable merit.

■ The first concerns a purported variance between the indictment and the proof at trial. The appellants all made motions for judgment of acquittal on Count 3, claiming that the one broad conspiracy charged therein, encompassing 117 overt acts and running from "the early part of 1983" to the "first part of April or May of 1987," was not borne out by the evidence at trial, which they believe showed, instead, a host of multiple, narrower, conspiracies. The appellants claimed, in the words of Justice Rutledge, that "[c]riminal they may be, but it is not the criminality of [one] mass conspiracy." *See Kotteakos v. United States*, 328 U.S. 750, 773, 66 S.Ct. 1239, 1252, 90 L.Ed. 1557 (1946). They also claimed that the purported variance caused prejudice to their "substantial rights." The district court found their claims lacking and denied their motions.

The appellants argue that the district court erred. They assert that our review

of its decision should turn on the following question: "Did the evidence at trial show the occurrence of one overall conspiracy, as charged in the indictment, or the occurrence of multiple, narrower, conspiracies?" If we were to tackle this question we would start with the definition of conspiracy: A conspiracy is "a combination or confederation between two or more people formed for the purpose of committing by their joint efforts, a criminal act," *United States v. Mayo*, 721 F.2d 1084, 1088 (7th Cir.1983); *see also United States v. Whaley*, 830 F.2d 1469, 1473 (7th Cir.1987), *cert. denied*, 486 U.S. 1009, 108 S.Ct. 1738, 100 L.Ed.2d 202 (1988); *United States v. Herrera*, 757 F.2d 144, 149 (7th Cir.1985), the gist of which "is an agreement among the conspirators to commit an offense, attended by an act of one or more of them to effect the object of the conspiracy." *United States v. Bruun*, 809 F.2d 397, 405 (7th Cir.1987). Armed with this definition we then would examine the proof and identify the conspiracy or conspiracies therein by determining the agreement or agreements (attended by overt acts), the parties thereto, and the illegal purpose or object of each. Having done so, we next would inquire whether the conspiracy or one of the conspiracies shown was that which was charged in Count 3. This inquiry would involve the identification of each conspiracy's bounds. To do this we would scrutinize the agreement around which the conspiracy turned, for "[t]he scope of the agreement determines the scope of the conspiracy," *id.*, and, in this particular context, "[i]t is the nature and scope of the agreement that is the determinative factor in distinguishing between single and multiple conspiracies." *United States v. Sababu*, 891 F.2d 1308, 1322 (7th Cir.1989); *United States v. Napue*, 834 F.2d 1311, 1332 (7th Cir.1987);

*United States v. Towers*, 775 F.2d 184, 189 (7th Cir.1985).

These things we would do were we to take up the question suggested by the appellants. But we will not take up the question. In performing a variance review we do not comb the evidence *de novo*, as the appellants might like. Our review is second-hand. The jury gets first crack at deciding "whether there is one conspiracy or several when the possibility of a variance appears." *United States v. Percival*, 756 F.2d 600, 609 (7th Cir.1985). This is so because a question of variance is a question of fact, which is something especially within the jury's realm of expertise. *See, e.g., Sababu*, 891 F.2d at 1322; *United States v. Molt*, 772 F.2d 366, 369 (7th Cir. 1985), *cert. denied*, 475 U.S. 1081, 106 S.Ct. 1458, 89 L.Ed.2d 715 (1986). In the proceedings below the jury examined and passed on the variance question, finding the appellants guilty of the one conspiracy charged in Count 3.[2] At this stage, the question for us simply is whether the evidence is sufficient to support the jury's determination. *See United States v. Mealy*, 851 F.2d 890, 895, 897, 898 (7th Cir.1988). We must view the proof at trial in the light most favorable to the prosecution, and we must uphold the jury's single conspiracy determination if *any* rational trier of fact could have found, beyond a reasonable doubt, the one conspiracy. *Sababu*, 891 F.2d at 1322; *United States v. Davis*, 838 F.2d 909, 913 (7th Cir.1988). "We give deference to the jury's weighing of the evidence and its drawing of reasonable inferences." *Id.* This deference is significant: given the nature of conspiracies, juries often must infer their existence and scope from circumstantial evidence and "the reasonable inferences drawn therefrom." *Whaley*, 830 F.2d at 1473.

**2.** The jury was instructed about the necessity of finding the existence of the Count 3 conspiracy before finding any of the defendants guilty. Part of that instruction reads as follows:

If you find that the conspiracy charged did not exist, then you must return a not guilty verdict even though you may find that some other conspiracy did exist. Similarly[,] if you find that a defendant was not a member of

the charged conspiracy then you must find that particular defendant not guilty even though the defendant may have been a member of some other conspiracy.

The jury returned verdicts of guilty against all defendants, so they answered the question affirmatively, finding that the conspiracy charged in Count 3 existed and that each defendant was a member of that conspiracy.

After reviewing the record in its entirety, we find the evidence more than sufficient to support the jury's finding of a single conspiracy. A single conspiracy exists "[i]f there is 'one overall agreement among the various parties to perform different functions in order to carry out the objectives of the conspiracy.' " *Sababu*, 891 F.2d at 1322 (quoting *United States v. Varelli*, 407 F.2d 735, 742 (7th Cir.1969)). "[Multiple] conspiracies exist when each of the conspirators' agreements has its own end, and each constitutes an end in itself." *Id.* (citing *Blumenthal v. United States*, 332 U.S. 539, 558–59, 68 S.Ct. 248, 257–58, 92 L.Ed. 154 (1947)). Here, the record belies the existence of multiple conspiracies: it shows that the Rectors did business as a group from 1983 to 1987, that Paiz, Allen, Cooper, and Selby were a part of that overall business,[3] and that the appellants " 'knowingly embraced a common criminal objective.' " *United States v. Boucher*, 796 F.2d 972, 975 (7th Cir.1986) (quoting *United States v. Ras*, 713 F.2d 311, 314 (7th Cir.1983)). It shows a basic, ongoing drug distribution conspiracy. And we have held, time and again, "that it is proper to view the type of conspiracy charged here—an ongoing drug distribution conspiracy involving core members who buy and sell to various suppliers and dealers who may change over time—as a single conspiracy rather than a series of smaller conspiracies." *United States v. Sophie*, 900 F.2d 1064, 1081 (7th Cir.1990). *See also United States v. Briscoe*, 896 F.2d 1476 (7th Cir.1990); *Mealy, supra; Davis, supra.*

This case presents one "common scheme or plan to distribute [drugs] in violation of the federal narcotics laws," *Percival*, 756 F.2d at 608, one integrated business, Justice Rutledge's "[one] mass conspiracy."[4] Accordingly, the trial court did not err by denying, on nonvariance grounds, appellants' motions for judgment of acquittal.

■ Closely related to the variance question is an issue raised by Allen, Cooper, and Selby. They argue that the district court erred in denying their motions for judgment of acquittal because the evidence is insufficient to establish that they were members—knowing participants—in the Rector & Sons conspiracy. Knowing participation is something the government is obliged to prove. *See United States v. Grandinetti*, 891 F.2d 1302, 1306 (7th Cir. 1989), *cert. denied*, —— U.S. ——, 110 S.Ct. 1534, 108 L.Ed.2d 773 (1990). Evidence of "mere association with conspirators, knowledge of a conspiracy, and presence during conspiratorial discussions," without more, will not do the trick. *Percival*, 756 F.2d at 610. Evidence must be presented "to support the inference that the defendant in some way joined and participated in the conspiratorial scheme." *United States v. Garcia*, 562 F.2d 411, 414 (7th Cir.1977).

■ We think that such evidence was presented. In the court below, proof was

---

3. Admittedly, these last four appellants were not totally involved in the Rectors' "business"; some of them were only tangentially involved. But a single conspiracy can take the form "of a small core of people with whom other conspirators knowingly participate to achieve the common purpose of the conspiracy," *Davis*, 838 F.2d at 913, even when the participation of those other conspirators is fleeting.

4. We recognize that "by definition" conspiracy "resists substantiation," *see Napue, supra,* 834 F.2d at 1332; that as a means to characterize experience the concept can prove itself difficult. Construing history as a single conspiracy, rather than multiple conspiracies, to some degree is a matter of gestalt. Thus, it is true, as appellants argue, that despite the evidence of an ongoing business and one overall conspiracy, each drug deal conceivably *could* be viewed as a separate agreement between conspirators, much like a

business treated as a corporation conceivably could be viewed as a nexus of separate transactions. But no matter. The one overall conspiracy stands even where separate agreements are recognized, for where separate agreements reach for a common goal, as they do in drug distribution networks, "separate agreements often form the basis for finding the existence of a single ongoing conspiracy." *Briscoe, supra,* at 1507. The existence of separate agreements is not dispositive. The integration of those agreements is. Like the appellants in *Blumenthal v. United States*, 332 U.S. 539, 68 S.Ct. 248, 92 L.Ed. 154 (1947), the appellants here, "[b]y their separate agreements, if such they were, ... became parties to the larger common plan, joined together by their knowledge of its essential features and broad scope, though not of its exact limits, and by their common single goal." *Blumenthal*, 332 U.S. at 558, 68 S.Ct. at 257.

introduced sufficient to support the finding that, beyond a reasonable doubt, Allen, Cooper, and Selby were members of, and knowingly participated in, the conspiracy.[5] This evidence the trio tries to make light of. They suggest that after considering the totality of evidence, including their own testimony, the proof against them is infected with inconsistencies and contradicted in many ways. They also suggest that the evidence of their knowledge in the scheme is unreliable, that it comes mostly from inference and the conclusory musings of depraved criminals. They point out that not one shred of direct evidence shows that they handled, loaded, or unloaded marijuana. All of this may be so, but to us, it is irrelevant. Our job is not to weigh the evidence or assess the credibility of the witnesses. *Whaley*, 830 F.2d at 1472; *United States v. Ramirez*, 796 F.2d 212 (7th Cir.1986). Our job is merely to determine if the evidence introduced is sufficient to support the jury's finding of knowing participation, a finding that may arise from circumstantial evidence and the reasonable inferences derivable therefrom. *See Whaley*, 830 F.2d at 1472–73. We think the evidence is sufficient, overwhelmingly so. Thus, the district court did not err in denying Allen's, Cooper's, and Selby's motions for judgment of acquittal.[6]

■ Allen and Selby raise another issue concerning their knowing participation in the conspiracy, this one addressed to the

---

5. Regarding Allen and Cooper, evidence was introduced showing the following: Allen admitted, in the fall of 1986, that she had run a load of marijuana down to Florida; Allen and Cooper each was paid by one of the Rector's drivers $500 that fall for marijuana transport services; both complained about the paltry sum, Cooper stating that the pair had received $1,000 each for the "load they hauled before"; both were at a meeting in which a trip to Nebraska to pick up marijuana was discussed; both drove a car to Nebraska, where it was loaded with marijuana, and where both were advised about the marijuana in the car, which they drove back to Florida. Regarding Selby, evidence was introduced showing the following: Selby was in need of money, and told this to a friend, who happened to be a Rector & Sons driver; the driver fixed Selby up with a position transporting marijuana for Ron Rector; Selby was seen with Tim Rector in Florida; Selby admitted, while he was in Florida, that he had driven a load of Rector marijuana down to Florida, that he could make two trips a week, and that he planned to return to Indiana to make another trip; Selby accompanied another driver who was carrying marijuana and actually did most of the driving on that trip; Selby accompanied other drivers to Nebraska, where the other drivers were told by Ron Rector that Selby would be taking a load down to Tim Rector in Florida; a car was loaded with marijuana, while Selby waited in a bar, and he drove the car, with another, to Tim Rector in Florida.

6. The indictment charged Selby with three crimes: conspiracy and two substantive offenses showing his participation in the conspiracy. The jury acquitted Selby on the substantive counts, yet convicted him of conspiracy.

Selby argues, in addition to his insufficiency of the evidence argument, that his conspiracy conviction is patently inconsistent with his acquittal on the substantive counts, and, therefore, that his conspiracy conviction must be reversed. His argument lacks merit. Even if the verdicts are characterized as inconsistent, that in itself means nothing. *See, e.g., United States v. Abayomi*, 820 F.2d 902, 907 (7th Cir.), *cert. denied*, 484 U.S. 866, 108 S.Ct. 189, 98 L.Ed.2d 142 (1987); *United States v. Torres*, 809 F.2d 429 (7th Cir.1987). Selby argues otherwise, asserting that his case is similar to that of *United States v. Morales*, 677 F.2d 1 (1st Cir.1982). Morales held that "a jury's acquittal of substantive counts operates as an acquittal of the underlying conspiracy count where the acquittal on the substantive counts constitutes a determination that *no overt act in support of the conspiracy took place.*" *Morales, supra*, at 3 (emphasis added). The rationale underlying *Morales* has been undermined by the Supreme Court, *see United States v. Powell*, 469 U.S. 57, 65, 105 S.Ct. 471, 476–77, 83 L.Ed.2d 461 (1984) (a jury that acquits a defendant on some counts may have acted out of leniency), and questioned by this Court, *see United States v. Isaksson*, 744 F.2d 574, 579 (7th Cir.1984). Even assuming that we would adopt it, it would have no application here. The government alleged 117 overt acts supporting the conspiracy. Two of them, overt acts 110 and 111, coincided with Selby's substantive counts. The jury acquitted Selby of those counts, so we will assume, *arguendo*, that overt acts 110 and 111 were not proven. Even so, there are 115 other overt acts to support the conspiracy. Unlike *Morales*, where no overt acts were left to support the conspiracy conviction, here there are many. That Selby is not directly implicated in those other overt acts is unimportant, for overt acts committed by co-conspirators are attributable to other members of the conspiracy. It only takes one overt act, by any one conspirator, to make the conspiracy charge stick against the whole lot. Assuming the best for Selby, then, his "inconsistent verdict" argument must fail.

propriety of the jury instructions, not the sufficiency of the evidence. In defining "knowledge" to the jury, the district court gave the following "ostrich" instruction:

Actual knowledge and deliberate avoidance of knowledge are the same thing. Thus, you may infer knowledge from a combination of suspicion and indifference to the truth. If you find that a person had a strong suspicion that things were not what they seemed or that someone had withheld some important facts[,] yet shut their eyes for fear of what he or she would learn[,] you may conclude that the person acted knowingly or with knowledge[,] as I have used these terms.

This Circuit has specifically approved the use of ostrich instructions in conspiracy cases. *See United States v. Kehm*, 799 F.2d 354, 362 (7th Cir.1986). The instruction above is taken almost *verbatim* from the language in *United States v. Ramsey*, 785 F.2d 184, 189, 190 (7th Cir.), *cert. denied, McCreary v. United States*, 476 U.S. 1186, 106 S.Ct. 2924, 91 L.Ed.2d 552 (1986), and *United States v. Holland*, 831 F.2d 717, 722 (7th Cir.1987), language later blessed for use in conspiracy cases. *See United States v. Diaz*, 864 F.2d 544, 549 (7th Cir.1988), *cert. denied*, — U.S. —, 109 S.Ct. 2075, 104 L.Ed.2d 639 (1989). Nevertheless, appellants claim that district courts cannot give the ostrich instruction willy-nilly in every conspiracy case. They argue that it is error to give the instruction in cases where jury confusion could result.[7] And they argue that this was such a case.

Yet in the trial court there was no risk of jury confusion. The facts and circumstances show that the instruction was properly given. Below, Allen and Cooper both claimed they were dupes, lovers of the conspirators but not conspirators themselves, unknowing pawns in the drug transport scheme. They claimed, in essence, that they participated in the conspiracy but did not do so knowingly. Yet the evidence belies the contentions of these two, raising strong inferences to the contrary. Such a scenario, one in which "the defendant acknowledges [her] association with the group but, despite circumstantial evidence to the contrary, denies knowledge of the group's illegal activity," is a paradigm case for use of the "ostrich" instruction. *Diaz*, 864 F.2d at 550.

Selby's case is somewhat different: he admitted knowledge of the criminal venture, but he claimed that he did not participate. Obviously, if Selby were being tried alone, the ostrich instruction would be unnecessary. But this does not mean that it was error for the judge to give it here. As noted above, the instruction was properly given because of the claims of other appellants. That generally is enough for its legality.

In any case, the instruction's effect against Selby and others similarly situated[8] was neutralized by other instructions. The trial court gave the jury a series of instructions going to the separate status of each defendant, *e.g.*, "You must give separate

---

**7.** The ostrich instruction does not add an element to an offense, nor does it take one away. It simply informs the jury of the meaning of "knowledge" and of certain types of evidence that show its presence. *See Ramsey*, 785 F.2d at 189; *Diaz*, 864 F.2d at 550 (quoting *United States v. Manriquez Arbizo*, 833 F.2d 244, 248–49 (10th Cir.1987)). It indicates "that a person who has enough knowledge to prompt an investigation and then avoids further knowledge really does know all that the law requires." *Holland*, 831 F.2d at 722. In the abstract, then, whenever a case involves an element of knowledge, the ostrich instruction could be given to help explain what "knowledge" means.

Nevertheless, we have bemoaned the giving of the instruction where, in reality, jury edification on the subtle shades of "knowledge" is unnecessary. In cases where there is no evidence of a

"'charade of ignorance,'" *Diaz*, 864 F.2d at 550 (quoting *Manriquez Arbizo*, 833 F.2d at 248–49), or an "awareness of a high probability of something [fishy], coupled with avoidance of further knowledge for fear of what [one] will learn," *Kehm*, 799 F.2d at 362, in cases where the appellants do not "'claim[ ] a lack of guilty knowledge'" and there are no "'facts and evidence that support an inference of deliberate ignorance,'" *United States v. Talkington*, 875 F.2d 591, 596 (7th Cir.1989) (quoting Eighth and Ninth Circuit cases), there is no need for the instruction. Giving it serves no purpose, and runs a risk, albeit a small one, that the jury will become confused, convicting people not for knowledge, but negligence.

**8.** Joe Rector's defense of nonparticipation was similar to Selby's.

consideration both to each count and to each defendant"; "Although the appellants in this case are being tried jointly you must give separate consideration to each defendant"; "Each defendant is entitled to have his or her case decided only by evidence and the law applicable to him or her." Thus, the implausibility of the claims of Allen and Cooper, in light of the ostrich instruction, would not taint Selby's case. And the court gave a "mere presence" instruction,[9] one that looks on Selby's claims of lack of participation favorably, and reinforced it with a "willing participation" instruction.[10] Both instructions tend to negate any chance that the jury would convict Selby on any finding other than that he knowingly joined and participated in the conspiracy. *See Diaz*, 864 F.2d at 551. Thus, the ostrich instruction was proper in regard to Allen and Cooper, and, at the very least, harmless in regard to Selby.

Next we consider some issues raised by Sam Paiz. He brings us a multitude, but we will discuss only two. The first, not surprisingly, relates to Count 3. Paiz argues that his conviction on that count is barred by the double jeopardy clause of the fifth amendment.[11] He was arrested in 1985 and prosecuted in Indiana state court for conspiracy to possess marijuana, with intent to distribute it. The factual basis for the state action is similar to the factual basis for his later prosecution in federal court, at least in some respects. In state court he pled guilty, and in 1987 he was sentenced to two years in jail.

Paiz does not argue that the United States cannot prosecute him because the state of Indiana already has. He concedes that under the dual sovereignty doctrine, two sovereigns, such as Indiana and the United States, may prosecute an individual for the same act if that act violates the laws of each.[12] *See e.g., Heath v. Alabama*, 474 U.S. 82, 106 S.Ct. 433, 88 L.Ed.2d 387 (1985); *United States v. Wheeler*, 435 U.S. 313, 98 S.Ct. 1079, 55 L.Ed.2d 303 (1978); *Abbate v. United States*, 359 U.S. 187, 79 S.Ct. 666, 3 L.Ed.2d 729 (1959); *Bartkus v. Illinois*, 359 U.S. 121, 79 S.Ct. 676, 3 L.Ed.2d 684 (1959); *United States v. Jordan*, 870 F.2d 1310 (7th Cir.), *cert. denied*, — U.S. —, 110 S.Ct. 101, 107 L.Ed.2d 65 (1989); *United States v. Jones*, 808 F.2d 561 (7th Cir. 1986), *cert. denied, Humphrey v. United States*, 481 U.S. 1006, 107 S.Ct. 1630, 95 L.Ed.2d 203 (1987); *United States v. Aleman*, 609 F.2d 298, 309 (7th Cir.1979), *cert. denied*, 445 U.S. 946, 100 S.Ct. 1345, 63 L.Ed.2d 780 (1980). Instead, Paiz argues that his case fits the doctrine's "sham prosecution" exception. This exception, derived from *Bartkus v. Illinois, supra*, holds that

---

9. The instruction reads as follows:

   The government must prove beyond a reasonable doubt from a defendant's own acts or statements that he or she was aware of the common purpose and was a willing participant. However, that person must knowingly associate himself or herself with the criminal adventure, participate in it, and try to make it succeed. Presence at the scene of the crime and knowledge that a crime is being committed are not sufficient[,] standing alone[,] to establish a defendant's guilt.

10. This instruction read, in relevant part, as follows: "The government must prove beyond a reasonable doubt from the defendant's own acts and statements that he was aware of the common purpose [of the conspiracy] and was a willing participant [in it].

11. That clause states, "nor shall any person be subject for the same offense to be twice put in jeopardy of life and limb." U.S. Const. amend. V.

12. This theory allowing dual prosecutions has been called the two-sovereignty principle, *see Bartkus v. Illinois*, 359 U.S. 121, 134, 79 S.Ct. 676, 684, 3 L.Ed.2d 684 (1959), or the dual sovereignty doctrine, *see Heath v. Alabama*, 474 U.S. 82, 88, 106 S.Ct. 433, 437, 88 L.Ed.2d 387 (1985). The doctrine is based on the common-law view of crime, that it is an offense against the sovereignty of government. *Heath*, 474 U.S. at 88, 106 S.Ct. at 437. "When the defendant in a single act violates the 'peace and dignity' of two sovereigns by breaking the laws of each, he has committed two distinct 'offenses.'" *Id.* The United States is sovereign, as is each of the united States. *See id.*, at 89, 106 S.Ct. at 437–38. Thus, "the same single act of a defendant may constitute more than one offense as he may have violated both federal and state laws for which he may be prosecuted." *United States v. Aleman*, 609 F.2d 298, 309 (7th Cir.1979), *cert. denied*, 445 U.S. 946, 100 S.Ct. 1345, 63 L.Ed.2d 780 (1980). Each sovereign may enforce its law; the double jeopardy clause will not block the way.

when sovereign A's prosecution serves merely as a "cover and tool" for sovereign B such that sovereign A's prosecution can rightly be called that of sovereign B, the prosecution brought by sovereign A is barred if it would be barred to sovereign B. *See, e.g., Bartkus,* 359 U.S. at 123–24, 79 S.Ct. at 678; *Aleman,* 609 F.2d at 309.

But the "sham prosecution" exception to the dual sovereignty doctrine, if it exists at all,[13] is a narrow one, an extremely narrow one. Cases of this Court dealing with claims of "sham prosecutions" have recognized this: We have uniformly rejected such claims. *See Jordan,* 870 F.2d at 1312–13; *Aleman,* 609 F.2d at 309. Other circuits have done likewise. *See, e.g., United States v. Moore,* 822 F.2d 35, 38 (8th Cir.1987); *United States v. Patterson,* 809 F.2d 244, 247 (5th Cir.1987); *United States v. Aboumoussallem,* 726 F.2d 906, 910 (2d Cir.1984); *United States v. Russotti,* 717 F.2d 27, 31 (2d Cir.1983), *cert. denied, Marino v. United States,* 465 U.S. 1022, 104 S.Ct. 1273, 79 L.Ed.2d 678 (1984); *United States v. Liddy,* 542 F.2d 76, 79 (D.C.Cir.1976). *See also United States v. Bernhardt,* 831 F.2d 181 (9th Cir.1987) (reversing district court finding of sham prosecution and remanding for further hear-

ing). Paiz presents nothing convincing us to deviate from this course. He does point out, among other things, that the United States Drug Enforcement Agency was actively involved in the state investigation and arrest, and that an Indiana prosecutor was later designated a Special Deputy United States Attorney for purposes of the federal prosecution. But these facts do not establish, as Paiz asserts, that "the two sovereigns were so intertwined that they were really one sovereign which prosecuted the Appellant twice." They do not even hint at such a conclusion.[14] At most they establish cooperative law enforcement efforts, efforts that are undeniably legal and, indeed, have been called "a welcome innovation." *See Jordan,* 870 F.2d at 1313; *Aleman,* 609 F.2d at 309. Accordingly, Paiz's double jeopardy argument must fail.

■ The second of Paiz's issues relates to the insufficiency of the government's proof to convict him of crimes other than conspiracy. Besides being charged and convicted of conspiracy, Paiz was charged and convicted of five instances of possession of marijuana with intent to distribute, and distribution of, marijuana, in violation of 21 U.S.C. § 841(a)(1). Our review of the record shows ample proof for these convic-

---

**13.** Although the "sham prosecution" theory was argued in *Bartkus,* the Court found that the prosecution in issue was not a "sham," *see Bartkus, supra,* 359 U.S. at 123–24, 79 S.Ct. at 678, so it never considered whether a "sham prosecution" would actually destroy "dual sovereignty" and lead to a double jeopardy violation. Although we have recognized the theory, *see, e.g., Aleman, supra,* we also have never reached the issue. Other circuits have questioned the theory's vitality. *See United States v. Patterson,* 809 F.2d 244, 247 n. 2 (5th Cir.1987).

**14.** Paiz argues that if the facts are not enough to prove a "sham prosecution," they are enough to require a hearing. Such a hearing was requested by Paiz below and rejected by the trial court. For support he cites cases of little relevance, except that of *Bernhardt, supra.* In *Bernhardt* the defendant produced evidence that the State of Hawaii tried to prosecute him for bank fraud and conspiracy, but failed because of the state statute of limitations. The state prosecutor then went to the United States Attorney, who had to that point been uninterested in the case, and lamented the dismissal of the state court action. The U.S. Attorney agreed to undertake a prosecution on the understanding that the state prosecutor would become the lead attorney for the

federal case, and be paid by the state, not the federal government. *Bernhardt* thus showed a frustration of one sovereign's attempts to enforce its laws, followed by the use of another sovereign by the first sovereign's personnel in an attempt to circumvent the frustrating circumstance. The district court found a sham prosecution; the Ninth Circuit reversed and remanded for further fact-finding on questions such as the involvement of federal officials once the decision to prosecute was made by the United States. It seems unlikely that the United State's prosecution could be considered that of Hawaii: although the state prosecutor was clearly resuscitating the efforts of his office, efforts blocked by the state statute of limitations, he was doing so as a federal agent, and he was doing so through federal laws.

We offer no opinion whether a hearing is necessary in a case such as *Bernhardt.* We merely note that the facts alleged by Paiz are not nearly as distasteful as those present there, and hold that no hearing was required in this case. The decision to grant Paiz a hearing was one essentially within the discretion of the district court. That discretion was not abused.

tions, with the exception of those relating to counts 8 and 10. These counts require some discussion.

Counts 8 and 10 relate to transactions in which Ron Rector bought large amounts of marijuana from a dealer named Stone. The only proof of these transactions comes from Stone, who testified at trial. Concerning the transaction underlying Count 8, Stone testified that Rector, Paiz, and another individual picked Stone up at his residence, and, in three cars, drove to a nearby tavern. Paiz and the other person went into the tavern, while Rector and Stone loaded two cars with marijuana. A similar sequence of events constituted the basis for Count 10. Stone also testified that Paiz and the others stayed at the tavern because he wanted them to: he did not want them to know where he kept his marijuana. The government asserts that with Stone's testimony, "the jury was warranted in concluding that Paiz was there to drive one of the two cars."

That may be. The question is whether that conclusion is enough to secure Paiz's convictions. It seems clear to us that the facts cannot establish Paiz's possession of marijuana, actual or constructive. To convict under § 841(a)(1) the government must introduce evidence from which a rational juror could conclude, beyond a reasonable doubt, that the defendant possessed a controlled substance. The best a rational juror can do here is to *guess* that Paiz *would* be in possession of a controlled substance. There is no evidence showing Paiz exercising actual physical control over the marijuana. Nor is there proof that Paiz had constructive possession of the marijuana, *i.e.*, that he had the right to possess the marijuana and the ability to exercise "ultimate control" over the drug. *See United States v. Manzella*, 791 F.2d 1263, 1266 (7th Cir.1986). Although it is clear that Paiz was at the tavern to drive a marijuana-laden car, nothing shows that he actually did drive such a car. For all one knows Paiz might have driven a car without marijuana, or he might have excused himself from the transaction altogether. Proof of possession cannot rest on speculation. And that is all one is left with here.

Despite the paucity of proof on Paiz's possession, the government argues that Paiz's convictions must stand. It asserts that Rector and Stone were members of the Rector & Sons conspiracy, as was Paiz, that the acts described in counts 8 and 10 were substantive crimes in furtherance of that conspiracy, and that, by virtue of *Pinkerton v. United States*, 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946), Paiz is liable for the substantive crimes committed in furtherance of the conspiracy, including those in counts 8 and 10. The *Pinkerton* doctrine, which is based on an agency theory, holds that "one conspirator can be held liable for the crimes of another if committed in furtherance of the conspiracy." *Manzella*, 791 F.2d at 1267. In order for the government to base a conviction on the *Pinkerton* doctrine the jury must be instructed in the *Pinkerton* theory of guilt, and instructed in an intelligent manner. *Id.*, at 1267–68. *See also United States v. Zabic*, 745 F.2d 464, 474–75 (7th Cir.1984) (upholding model *Pinkerton* instruction). As we noted in *Manzella*, "[t]he jury must be made to focus on the coconspirator's act, on whether it is a crime, on whether the coconspirator's guilt of this crime was proved beyond a reasonable doubt, and on whether it was committed in furtherance of the conspiracy in which the defendant participated." 791 F.2d at 1268.

Here the jury was instructed, and in an intelligent manner. The instruction reads as follows:

If you find that the defendant is guilty of conspiracy as charged in Count 3 you may also find the defendant guilty of a substantive offense as charged in another count of the indictment[,] provided that you find that the essential elements of that count as defined in these instructions have been established beyond a reasonable doubt and provided that you also find beyond a reasonable doubt the following:

First: That the offense defined in the substantive count was committed pursuant to the conspiracy[,] and

Second: That the defendant was a member of the conspiracy at the time the substantive count was committed.

Under the conditions just defined[,] a defendant may be found guilty of a substantive count even though he did not participate in the acts constituted in the offense as defined in the substantive count. The reason for this is that a coconspirator committing a substantive offense pursuant to a conspiracy is held to be the agent of other conspirators.

This particular instruction has been specifically approved by this Court in *Zabic, supra,* and *Manzella, supra.*

Thus, the jury was properly instructed on the *Pinkerton* theory of guilt. It could find, quite easily, that the possession of the marijuana by Rector and Stone violated 21 U.S.C. § 841(a)(1) and was in furtherance of the Count 3 conspiracy. And as it did find that Paiz was a member of that conspiracy, we are obliged to uphold Paiz's convictions on counts 8 and 10.

We wish to touch on one last conviction-related issue. Joe Rector argues that the district court erred in permitting a government witness to testify at trial about certain statements made by Rector, and as a result his convictions should be reversed.[15] The witness was a Nebraska police officer, Blubaugh, who had arrested Rector in 1983. After his arrest, Rector agreed to cooperate with the police. Part of that cooperation consisted of an interview with Blubaugh in which Rector made certain statements admitting his and his family's participation in the marijuana business.

The government called Blubaugh as a witness. On direct examination, the government elicited nothing about the post-arrest statements made by Rector. On cross-examination, Rector asked Blubaugh about Blubaugh's unlisted 1983 phone number and about some police photographs of Rector. The information was elicited by Rector, apparently, to show that Blubaugh and Rector were chums, or at least that they knew each other. On rebuttal, the government sought to introduce evidence that Rector had agreed to cooperate with the Nebraska police department after his arrest in 1983 and that Rector obtained Blubaugh's unlisted phone number while so cooperating. The government also sought to introduce the substance of Rector's oral statements made in the interview with Blubaugh. Rector objected to the introduction of the statements on the basis of Federal Rule of Criminal Procedure 16.

Upon the pretrial request of a defendant, the government is required to permit the defendant to inspect, copy, and photograph, among other things, the following:

> any relevant written or recorded statements made by the defendant, or copies thereof, within the possession, custody or control of the government, the existence of which is known, or by the exercise of due diligence may become known, to the attorney for the government; [and] the substance of any oral statement which the government intends to offer in evidence at the trial made by the defendant whether before or after arrest in response to interrogation by any person then known to the defendant to be a government agent.

FED.R.CRIM.P. 16(a)(1)(A). This duty to permit inspection is a continuing one; if extra material is discovered later, the government must inform the defendant and permit his inspection. Fed.R.Crim.P. 16(c). Rector made a Rule 16 pretrial request. He received nothing from the government other than a reminder of the interview he had with Blubaugh.

The court sustained Rector's objection on Rule 16 grounds, preventing Blubaugh

---

**15.** In his brief, Rector also argues that the district court, in denying his last minute motion to sever, abused its discretion. Generally, arguments concerning the denial of a motion to sever are waived if the motion is not renewed at the close of evidence. *United States v. Brown,* 870 F.2d 1354, 1360 (7th Cir.1989). The court below denied Rector's motion, but did so with leave to renew when Rector put together a proper record supporting his position. Rector never put together a record, proper or otherwise, and never renewed the motion. Only if Rector shows us that renewing his motion would be useless can he escape having waived his argument. *Id.* The court's explicit leave to renew shows the opposite, *see id.,* and Rector has not even argued as much. Thus, his argument regarding severance is waived.

from testifying about the substance of what Rector had told him. The court warned Rector, however, that it felt he had "opened the door" for such testimony. The court made the government disclose the substance of Rector's oral statements to Rector, and Rector was advised that with any further "opening" on his part, the court would allow the government to let Blubaugh testify whole hog.

Blubaugh's testimony ended, and he returned to his home in Lexington, Kentucky. The government eventually ended its case-in-chief. After the passage of some time, Rector took the stand in his own defense. In so doing, he testified that in 1983 he was not involved in the marijuana business, and that he never made any statements to Blubaugh about his involvement in the marijuana business. The government felt that Rector had opened the door for the entry of his oral statements, and called Blubaugh back from Kentucky. Returning more than a week after he had first testified, and in possession of some newly found notes of his interview with Rector,[16] Blubaugh testified in rebuttal, with the court's permission, and over Rector's motion for a mistrial, about the statements made by Rector.

Matters concerning Rule 16 are committed to the sound discretion of the district court. A defendant seeking relief from an order made under Rule 16 must show that the district court's handling of the matter was error, and " 'that the error was prejudicial to the substantive rights of the defendant.' " *United States v. Bastanipour,* 697 F.2d 170, 175 (7th Cir.1982), *cert. denied,* 460 U.S. 1091, 103 S.Ct. 1790, 76 L.Ed.2d 358 (1983). Rector has shown neither. In allowing Blubaugh to testify about the statements made by Rector, the court was acting well within permissible bounds. First, it is doubtful whether the government breached Rule 16 at all. By the Rule's very terms, the government is to disclose only those oral statements the substance of which it intends to introduce into evidence at trial. There is nothing here to suggest that, before the cross-examination of Blubaugh, the government intended to introduce the substance of Joe Rector's oral statements. Only after certain matters were elicited from Blubaugh on cross-examination did the government decide to introduce the statements, and at that point it disclosed to Rector the substance of those statements. Second, even if we assume that the government should have disclosed the substance of Rector's statements at an earlier time, it is clear that nothing the district court did could be considered erroneous. If Rule 16 is breached, the remedy lies in the hands of the district court. FED.R.CRIM.P. 16(d)(2). Among the many remedies, "the court may order [the government] to permit the discovery or inspection, grant a continuance, or prohibit the [government] from introducing evidence not disclosed, or it may enter such other order as it deems just under the circumstances." *Id.* The court's decision on this matter is discretionary. And here that discretion was well exercised. The court initially sustained Rector's objection, letting the statements in only after their substance had been disclosed, time had passed, and Rector, with full knowledge of them, chose to take the stand and deny that they were ever made. The court's handling of the situation was commendable; its orders, taken in the aggregate, were "just under the circumstances." Lastly, Rector is unable to demonstrate prejudice, much less prejudice affecting his substantial rights. He was advised of his conversation with Blubaugh before trial; he was advised of the substance of that conversation during trial, well before his defense; and he was given the power to keep the substance of the conversation

---

16. After he testified in the government's case-in-chief, Blubaugh apparently dug the notes out of some boxes at his home. He no longer was employed by the state police, and he did not maintain files, other than the boxes, of his dealings with persons when so employed. The government was not made aware of the notes until the day Blubaugh testified on rebuttal, and no one has suggested that it could have discovered their presence with a reasonable amount of due diligence. Indeed, the defendants agreed with the district court's finding, relating to everything connected with the Rule 16 matter, that "these ... prosecutors have played straight up in this case" and that "there is no sandbagging and there is no deliberate gamesmanship."

from reaching the jury, a power he chose not to exercise.

Thus, Rector's convictions must stand. So too must those of the other appellants.

## III.

On February 3, 1989, the trial judge sentenced the appellants.[17] He did so for certain of the offenses pursuant to 21 U.S.C. § 841(b), which prescribes punishment for violators of 21 U.S.C. § 841(a)(1) and certain violators of 21 U.S.C. § 846.

The appellants raise four issues with respect to this sentencing. The first we address is whether the sentences imposed on two of the appellants, Tim Rector and Sam Paiz, are illegal because they were imposed pursuant to a version of 21 U.S.C. § 841(b) that was not in effect at the time the crimes to which the sentences relate were committed. Rector argues that each 10 year sentence he received on counts 27, 31, and 33 is illegal because the sentences were based upon the provisions of § 841(b), as amended by the Controlled Substances Penalties Amendments Act of 1984 (the CSPAA), 1984 U.S.CONG. & ADMIN.NEWS (98 Stat.) 2068, 2068–69, Chapter V of the Comprehensive Crime Control Act of 1984 (the CCCA), Pub.L. No. 98–473, 1984 U.S.CONG. & ADMIN.NEWS (98 Stat.) 1976. Rector claims that the CSPAA became effective on November 1, 1987, and applies only to crimes committed after that date. November 1, 1987 is well after the date the crimes in counts 27, 31, and 33 were committed. Because of this, he argues, his sentencing

should be governed by the provisions of § 841(b) unamended by the CSPAA. Paiz makes a similar argument with respect to his 20 year sentence under Count 3 and his 15 year sentences under counts 8, 10, 14, 15, and 16. He claims that he was sentenced under a version of § 841(b) that was amended by the CSPAA and also the Narcotics Penalties and Enforcement Act of 1986 (the NPEA), 1986 U.S.CONG. & ADMIN. NEWS (100 Stat.) 3207–2, 3207–2 to 3207–8, Title I, Subtitle A of the Anti–Drug Abuse Act of 1986 (the ADAA), Pub.L. No. 99–570, 1986 U.S.CONG. & ADMIN.NEWS (100 Stat.) 3207. Paiz argues that the effective dates of both the CSPAA and the NPEA are November 1, 1987, and he points out that the crimes in counts 8, 10, 14, 15, and 16 occurred before that date. Paiz argues that his sentencing should be based on the version of § 841(b) unamended by these acts. Because his sentences were based not on that version, but on § 841(b) as amended by the CSPAA and the NPEA, Paiz believes that his sentences should be vacated.

In the normal course of affairs, to determine if a defendant received a legal sentence we simply look to the language of the sentencing provision. Our problem here lies with the fact that the statute under which Rector and Paiz were sentenced, 21 U.S.C. § 841(b), has not had a static existence of late. Its language has changed higgledy-piggledy over the course of the years as Congress has rushed to up the drug-dealing ante. To determine if Paiz and Rector's sentences are legal, we first

---

**17.** He did so as follows: Sam Paiz received, on Count 3, 20 years in jail and a $50 special assessment, and on counts 8, 10, 14, 15, and 16, 15 years in jail, a three year term of special parole, and a $50 special assessment; Doug Rector received, on Count 3, 40 years in jail, a $100,000 fine, and a $50 special assessment, on counts 12, 14, 15, 16, 18, and 23, 15 years in jail, a three year term of special parole, and a $50 special assessment, on counts 4, 19, and 22, five years in jail and a $50 special assessment, and on count 37, five years in jail, a four year term of supervised release, and a $50 special assessment; Dick Selby received, on Count 3, five years in jail and a $50 special assessment; Leann Cooper received, on Count 3, five years, 90 days to serve in jail with the remainder suspended, a three year term of special parole,

and a $50 special assessment; Joe Rector received, on Count 3, five years in jail and a $50 special assessment; Barbara Allen received, on Count 3, five years, six months to serve in jail with the remainder suspended, a three year term of special parole, and a $50 special assessment; and Tim Rector received, on Count 3, 30 years in jail, a $100,000 fine, and a $50 special assessment, on counts 27, 29, 31, and 33, 10 years in jail, a three year term of supervised release, and a $50 special assessment, on counts 24, 26, 28, 30, 32, 34, and 35, five years in jail and a $50 special assessment, and on Count 36, five years in jail, a two year term of special parole, and a $50 special assessment. All sentences were concurrent, all special assessments consecutive, credit was granted for time served.

must determine what version of 21 U.S.C. § 841(b) applies to their crimes.

Section 841(b) was created in 1970 by the Controlled Substances Act (the CSA), 84 Stat. 1261–62, *reprinted* in 1970 U.S.CONG. & ADMIN.NEWS pp. 1437, 1444, 1467–68, Title II of the Comprehensive Drug Abuse Prevention and Control Act of 1970, Pub.L. No. 91–513, 84 Stat. 1236, *reprinted in* 1970 U.S.CONG. & ADMIN.NEWS 1437. Section 202 of the CSA set up a five part drug-identification scheme in which drugs were listed, according to certain criteria, in schedules I through V. Marijuana was a schedule I drug. *See* CSA § 202(c). Referring to section 202's classification scheme, CSA section 401(b) (codified as 21 U.S.C. § 841(b)) set up sentences for violators of section 401(a) (codified as 21 U.S.C. § 841(a)) and, derivatively, of section 406 (codified as 21 U.S.C. § 846). Section 401(b)(1)(A) set up a sentencing range for crimes involving schedule I or II narcotic drugs. For crimes involving schedule I or II non-narcotic drugs, including marijuana, or schedule III drugs, section 401(b)(1)(B) set up a sentencing range of zero to five years in custody, a zero to $15,000 fine, and two years on special parole. Section 401(b)(2) set up a sentencing range for crimes involving schedule IV drugs, as did section 401(b)(3) for crimes involving schedule V drugs.

The CSA was amended in 1978 by the Psychotropic Substances Act of 1978 (the PSA), Pub.L. No. 95–633, 1978 U.S.CONG. & ADMIN.NEWS (92 Stat.) 3768, 3774, and again in 1980 by the Infant Formula Act of 1980 (the IFA), Pub.L. No. 96–359, 1980 U.S.CONG. & ADMIN.NEWS (94 Stat.) 1190, 1194, after which new subsection 401(b)(6) had been added. *See* IFA § 8(c)(2). Subsection (6) related specifically to marijuana. IFA § 8(c)(2). In the event the crime involved over 1000 pounds of marijuana, sentencing was by subsection (6) rather than subsection (1)(B), subsection (6) providing, in general, a sentencing range of zero to 15 years in custody and a zero to $125,000 fine. *Id.* Thus, for marijuana at least, the CSA, as amended, set up a two-pronged sentencing regime, the sentences depending upon the amount of marijuana involved in the crime. All of this was codified in § 841(b). This version of the statute is the one Rector and Paiz claim applies to them.

The CSA, and § 841(b), stood this way until Congress, on October 12, 1984, passed the CCCA. The CCCA contains 23 chapters, two of which merit discussion. The first is Chapter V of the Act, the CSPAA. It made extensive changes to the CSA. Among other things, CSA subsections 401(b)(1)(A) and (B) were redesignated (B) and (C) and a new subsection (A) was added. CSPAA § 502(1)(A). New subsection 401(b)(1)(C) was made to apply to crimes involving less than 50 kilograms of marijuana. CSPAA § 502(1)(C). New subsection 401(b)(1)(B) was made to apply to crimes involving 50 kilograms of marijuana or more. *See* CSPAA §§ 502(1)(B), (C). CSA subsection 401(b)(6) was struck. CSPAA § 502(5). Thus after the CSPAA, penalties for § 841(a) crimes involving marijuana depended upon whether the amount of marijuana involved was less than 50 kilograms. If it was, CSA section 401(b)(1)(C), as amended, set up a general sentencing range of zero to five years in custody, a zero to $50,000 fine, and two years on special parole. If it was not, CSA section 401(b)(1)(B), as amended, set up a general sentencing range of zero to 15 years in custody, zero to $125,000 in fines, and three years on special parole.

The second chapter of the CCCA meriting discussion is Chapter II, better known as the Sentencing Reform Act of 1984 (the SRA), Pub.L. No. 98–473, 1984 U.S.CONG. & ADMIN.NEWS (98 Stat.) 1987. The SRA amended the CSA's old subsections 401(b)(1)(A) and (B) by striking out the language relating to special parole. *See* SRA § 224(a). This amendment was not effective right away, however; it was delayed until November 1, 1986, *see* SRA § 235(a)(1), and by later Congressional action, *see* Sentencing Reform Amendments Act of 1985, § 4, Pub.L. No. 99–217, 1984 U.S.CONG. & ADMIN.NEWS (99 Stat.) 1728, until November 1, 1987.

Congress was not long satisfied with its work. It again amended the CSA on October 27, 1986, when it passed the ADAA.

Title I, Subtitle A of the ADAA, the NPEA, revamped CSA section 401. Section 1002 of the NPEA redesignated CSA subsection 401(b)(1)(C) as subsection 401(b)(1)(D), struck CSA subsections 401(b)(1)(A) and (B), and added new subsections 401(b)(1)(A), (B), and (C). NPEA §§ 1002(1), (2). New subsection 401(b)(1)(A) prescribed punishment for certain crimes involving 1000 kilograms or more of marijuana. NPEA § 1002(2). New subsection 401(b)(1)(B) did the same for certain crimes involving 100 kilograms or more of marijuana. It set up a general sentencing range of five years to 40 years in custody when the case does not involve death or serious bodily injury, 20 years to life when it does, fines ranging up to $2,000,000 for individuals and up to $5,000,-000 otherwise, and at least a four year term of "supervised release." *Id.* New subsection 401(b)(1)(C) prescribed punishment for certain crimes involving 50 kilograms or more of marijuana. *Id.* It set up a general sentencing range of zero to 20 years in custody when the case does not involve death or serious bodily injury, 20 years to life when it does, fines ranging up to $1,000,000 for individuals and up to $5,000,000 otherwise, and at least a three year term of "supervised release." *Id.* New subsection 401(b)(1)(D) prescribed punishment for certain crimes involving less than 50 kilograms of marijuana (unless the cases also involved more than 100 marijuana plants). It kept the same penalties as did old subsection 401(b)(1)(C), but limits on fines were raised upward. *See* NPEA § 1003(a)(1). In addition to these changes, section 1004(a) of the NPEA substituted the words "term of supervised release" throughout the CSA wherever the words "special parole term" were present. Section 1004(b) mandated, in so many terms, that section 1004(a) would not become effective until November 1, 1987. *See* NPEA § 1004(b) (referring to 18 U.S.C. § 3583).

Thus, we have a summary history of the CSA, as codified at 21 U.S.C. § 841(b), at least until the relevant date of November 1, 1987. We must now determine the effective date of the amendments affecting § 841(b), specifically those occurring in 1984 and 1986. This step is easy. Other courts, as well as this one on prior occasions, have already addressed the issue. The CSPAA was passed on October 12, 1984. That is the effective date for the amendment; *see United States v. Portillo,* 863 F.2d 25, 26 (8th Cir.1988); *United States v. Meyers,* 847 F.2d 1408, 1414, 1416 (9th Cir.1988); crimes committed before that date are not subject to the Act's provisions. Thus, the sentencing for § 841(a) and certain § 846 crimes committed before October 12, 1984 are governed by § 841(b) as it looked before being amended by the CSPAA. The sentencing for such crimes committed after October 11, 1984 are governed by § 841(b) as amended by the CSPAA. The SRA was also passed on October 12, 1984, but its effective date was postponed until November 1, 1987. *United States v. Stewart,* 865 F.2d 115, 116 (7th Cir.1988). Thus, relevant crimes committed before November 1, 1987 are subject to § 841(b) as amended by the CSPAA, but not by the SRA. *See id.* at 116, 118. *See also* Sentencing Act of 1987, Pub.L. No. 100–182, § 2(a), 101 Stat. 1266 (1987). The NPEA was passed on October 27, 1986. The amendments to § 841(b) made by section 1004(a) of that Act were postponed until November 1, 1987, to coincide with the effective date of changes made by the SRA, and do not apply to crimes committed before November 1, 1987. *United States v. Duprey,* 895 F.2d 303, 311 (7th Cir.1989). *See also United States v. Padilla,* 869 F.2d 372, 381 (8th Cir.), *cert. denied, Pericheitte v. United States,* —— U.S. ——, 109 S.Ct. 3223, 106 L.Ed.2d 572 (1989). Those made by section 1002, however, were not so postponed. They became effective on the date Congress passed the Act, October 27, 1986. *Duprey,* 895 F.2d at 311. *See also Padilla,* 869 F.2d at 382; *Meyers,* 847 F.2d at 1414, 1415. So too the amendments made by section 1003 became effective on October 27, 1986. *Meyers,* 847 F.2d at 1414, 1415. The NPEA's enhanced penalty provisions, then, apply to crimes committed on or after that date. *See Duprey,* 895 F.2d at 311. *See also United States v. Ferryman,* 897 F.2d 584, (1st Cir.1990) (analysis of legislative history). Thus, the sentenc-

ing for § 841(a) and certain § 846 crimes committed after October 11, 1984 but before October 27, 1986 are governed by the version of § 841(b) amended by the CSPAA, but not by the SRA or the NPEA. Sentencing for such crimes committed after October 26, 1986 but before November 1, 1987 are governed by the version of § 841(b) amended by the CSPAA and sections 1002 and 1003 of the NPEA, but not by the SRA or section 1004(a) of the NPEA. Sentencing for the relevant crimes committed after October 31, 1987 are governed by the version of § 841(b) amended by the CSPAA, the SRA, and all sections of the NPEA.

A comparison of the appellants' sentences with the language from the correct version of § 841(b) shows the sentences received by Paiz legal, those received by Rector illegal in part. Tim Rector received, for each of the counts 27, 31, and 33, a sentence of 10 years in custody, a three year term of supervised release, and a special assessment of $50. Counts 27, 31, and 33 allege that Rector possessed with intent to distribute and distributed marijuana in excess of 50 kilograms. The crimes in these counts were allegedly committed on or around November 9, 1986, November 25, 1986, and November 25, 1986, respectively. The appropriate version of § 841(b), then, is that amended by the CSPAA and sections 1002 and 1003 of the NPEA, and the appropriate subsection is 841(b)(1)(C), dealing with cases involving 50 kilograms or more of marijuana. Rector's sentence of 10 years in custody is well within the general range specified by the statute of zero to 20 years. Also within the language of 841(b)(1)(C) is the three year term of supervised release, but here we hit a problem.

■ The general drift of the SRA and section 1004(a) of the NPEA is that "term[s] of supervised release" shall not be imposed for § 841(b) crimes committed before November 1, 1987. *See Duprey,* 895 F.2d at 311. *See also Ferryman,* 897 F.2d at 591; *Mercado v. United States,* 898 F.2d 291, 293 (2nd Cir.1990); *United States v. Levario,* 877 F.2d 1483, 1488–89 (10th Cir.1989); *United States v. Posner,* 865

F.2d 654, 660 (5th Cir.1989); *Portillo,* 863 F.2d at 26; *United States v. Whitebread,* 849 F.2d 849, 860 (4th Cir.), *cert. denied,* 488 U.S. 983, 109 S.Ct. 534, 102 L.Ed.2d 566 (1988); *United States v. Smith,* 840 F.2d 886, 889 (11th Cir.), *cert. denied,* 488 U.S. 859, 109 S.Ct. 154, 102 L.Ed.2d 125 (1988); *United States v. Byrd,* 837 F.2d 179, 182 (5th Cir.1988). For those crimes, § 841(b) mandates the imposition of special parole terms. *Duprey,* 895 F.2d at 311. *See also Mercado,* 898 F.2d 291; *Posner,* 865 F.2d at 660; *Portillo,* 863 F.2d at 26; *Whitebread,* 849 F.2d at 860; *Smith,* 840 F.2d at 889; *Byrd,* 837 F.2d at 182. *But see United States v. Torres,* 880 F.2d 113 (9th Cir.1989) (referring to § 841(b)(1)(A)), *cert. denied,* — U.S. —, 110 S.Ct. 873, 107 L.Ed.2d 956 (1990). This is so even though the October 27, 1986 amendments of section 1002 of the NPEA use the phrase "term of supervised release" rather than "special parole term" in subsections 841(b)(1)(A), (B), and (C). *See* NPEA § 1002(2). The use of this phrase has been recognized as nothing more than "confusing statutory draftsmanship," *Byrd,* 837 F.2d at 181 n. 8, a case of "inartful scrivening," *Ferryman,* No. 89–1486 at 11. Thus, the imposition upon Rector of the three year term of supervised release is illegal. Instead, he should receive a three year term on special parole.

■ Sam Paiz received a sentence on Count 3 of 20 years and a $50 special assessment. Count 3 is the conspiracy count. The indictment alleges that the conspiracy ran from "the early part of 1983" to "the first part of April or May of 1987." Because the conspiracy ran after October 27, 1986, the appropriate version of § 841(b) is the same as applied above to Tim Rector. *See United States v. Story,* 891 F.2d 988 (2d Cir.1989) (concerning Sentencing Guidelines); *United States v. Lee,* 886 F.2d 998 (8th Cir.1989) (same), *cert. denied, Paige v. United States,* — U.S. —, 110 S.Ct. 748, 107 L.Ed.2d 765 (1990). The indictment does not specifically allege the amount of marijuana involved in the conspiracy, but, as we determine *post,* it is safe to say that more than 100 kilograms was involved. This would make subsection

841(b)(1)(B) the relevant subsection, and Paiz's 20 year sentence is within the range mandated by that subsection. On the other counts Paiz received a sentence of 15 years, a three year term on special parole, and a $50 special assessment. Counts 8, 10, 14, 15, and 16 each allege the possession of marijuana in excess of 50 kilograms with intent to distribute. The dates on which these crimes were purportedly committed were the fall of 1985, the fall of 1985, March of 1986, March of 1986, and March 30, 1986, respectively. Thus, the appropriate version § 841(b) is the one amended by the CSPAA but untouched by the SRA or the NPEA, and the relevant subsection of that statute is subsection 841(b)(1)(B). It set up a sentencing range of zero to 15 years in custody, zero to $125,000 in fines, and a three year term on special parole. Paiz's sentences on counts 8, 10, 14, 15, and 16 are all within the mandate of this subsection, and, therefore, are legal.

■ The second issue raised, by all the appellants, is that the enhanced sentencing they received for their conspiracy conviction on Count 3 is illegal because sentencing under § 841(b) depends on the amount or weight of the drug involved in the offense, yet Count 3 of the superseding indictment fails to allege the specific amount or weight of marijuana involved in the conspiracy. The appellants, citing *United States v. Alvarez*, 735 F.2d 461 (11th Cir. 1984), *United States v. Crockett*, 812 F.2d 626 (10th Cir.1987), and *United States v. Brandon*, 847 F.2d 625 (10th Cir.1988), *cert. denied*, 488 U.S. 973, 109 S.Ct. 510, 102 L.Ed.2d 545 (1989), claim that before enhanced penalties pursuant to § 841(b)(1)(B) may be imposed the indictment must charge them not only with conspiracy, but with conspiracy involving 100 kilograms or 100 plants of marijuana. The appellants note "that the specific quantities of marijuana are set out in the overt acts, but they are not specified in the charging portion of Count 3." Because no specific amount or weight is alleged in the charging portion, the appellants' argument runs, the appellants should be sentenced according to the nonenhanced provisions of

§ 841(b)(1)(D). The government counters the appellants' argument by asserting that the overt acts portion of Count 3 apprises the appellants of the amount or weight involved in the conspiracy, and, therefore, that Count 3 is sufficient to support enhanced sentencing. The question for us, then, is whether a count that charges a party with a § 846 conspiracy, but alleges the amount of the drug involved only in the overt acts portion of the count, is sufficient to support enhanced sentencing pursuant to § 841(b).

This question was considered and specifically addressed in *United States v. Gibbs*, 813 F.2d 596 (3d Cir.), *cert. denied*, 484 U.S. 822, 108 S.Ct. 83, 98 L.Ed.2d 45 (1987). In *Gibbs*, the defendant was convicted of a § 846 conspiracy and sentenced to enhanced penalties under § 841(b) on the district court's determination that the conspiracy involved over 1000 pounds of marijuana. The conspiracy count of the indictment did not specifically charge the defendant with conspiracy to possess over 1000 pounds of marijuana, nor did it mention any provision of § 841(b). One of the count's listed overt acts, however, mentioned a plane carrying 1,487 pounds of marijuana. The Third Circuit made clear its position that § 841(b) was a penalty provision only, not an essential element of conspiracy; thus, the amount or weight of the drug involved in the § 846 conspiracy did not have to be alleged to obtain a § 846 conviction. 813 F.2d at 599–600. Nevertheless, the court held that an allegation in the indictment of quantity was required "before an enhanced penalty may be imposed." *Id.*, at 600. But because the overt act portion of the indictment mentioned the amount of marijuana in the plane, the Third Circuit held that the requirement was met, *see id.*, at 601, finding "that the indictment *as a whole* fairly informed Gibbs of the amount of marijuana ... which would subject him to the enhanced penalty provision of § 841(b)[ ]." *Id.*, at 599.

We find *Gibbs* persuasive, particularly in light of precedent from this Circuit. We have found, like the court in *Gibbs*, that § 841(b) is a penalty provision, having

"nothing to do with the substantive elements of the underlying offense." *United States v. Acevedo*, 891 F.2d 607, 611 (7th Cir.1989). Despite this, we also have found, like the court in *Gibbs*, that should the government wish to seek enhanced penalties under § 841(b), "[t]he indictment need not cite to an enhanced penalty provision, but [it] ... must ... make a defendant aware of the possibility that enhanced penalty provisions could apply." *United States v. Ocampo*, 890 F.2d 1363, 1373 (7th Cir.1989). To determine if the indictment has done so, we " 'consider the challenged count as a whole and ... refrain from reading it in a hypertechnical manner.' " *Id.* (quoting *United States v. Gironda*, 758 F.2d 1201, 1209 (7th Cir.), *cert. denied, Spiess v. United States*, 474 U.S. 1004, 106 S.Ct. 523, 88 L.Ed.2d 456 (1985)). Included within the ambit of our consideration is the overt acts section of a conspiracy count. *United States v. Kahn*, 381 F.2d 824, 829–30 (7th Cir.), *cert. denied*, 389 U.S. 1015, 88 S.Ct. 592, 19 L.Ed.2d 661 (1967). *See also United States v. Chiattello*, 804 F.2d 415, 421 (7th Cir.1986) (overt acts may be relied on as a predicate for a CCE count). "Since an overt act is part of the offense, [there] is no reason why it may not be used to clarify the remainder of the count." *Kahn*, 381 F.2d at 830.

The overt acts section of Count 3 certainly "clarifies" the count with respect to the amount of marijuana involved in the conspiracy. Overt act 1 lists the involvement of 200 pounds of marijuana; act 2, 300 pounds; acts 5 and 6, 600 pounds; act 7, 1,500 to 2,000 pounds; act 8, 185 pounds; act 9, 1,500 to 2,000 pounds; act 10, 1,500 pounds. We could go on through all 117 overt acts, including many that occurred after the effective date of the NPEA, but doing so would amount to overkill. Count 3 properly apprises the appellants of the amount and weight of marijuana involved in the conspiracy, well over 100 kilograms. It informs them of the possibility of enhanced sentencing, and does so with a "plain, concise, and definite" description of the essential facts that will permit such sentencing. *See Ocampo*, 890 F.2d at 1373. The indictment, therefore, is suffi-

cient, and the appellants' argument to the contrary must fail.

■ The last issues are raised by Sam Paiz. He first asserts that he cannot be subject to enhanced sentencing for his conviction on Count 3, because the trial court, although it instructed the jury on the elements of conspiracy, never instructed it "on any element of weight" or "amount of marijuana." As the jury "made no determination regarding the amount of marijuana," Paiz argues, "there [is] no basis available for applying the enhanced penalties." But as previously noted, § 841(b) is an enhanced penalty provision, and "[a]s an enhanced penalty provision, its elements need not be charged to the jury but instead are to be considered by the court at sentencing." *Ocampo*, 890 F.2d at 1372. No mention of amount or weight is necessary in the jury instructions "[b]ecause the quantity of the controlled substance is a sentencing issue unrelated to the defendant's underlying guilt," *Acevedo*, 891 F.2d at 611, and sentencing is a matter reserved for the judge. *See Ocampo*, 890 F.2d at 1372. Thus, the trial court's instruction is not defective. Despite the absence in the instruction of any mention of amount or weight, Paiz remained subject to the full force of the enhanced sentencing provisions of § 841(b).

■ Paiz next asserts that, even so, the evidence is insufficient to establish the amount or weight necessary to justify his sentences, at least with respect to those received for his conviction on counts 14, 15, and 16. Those counts charge Paiz with similar offenses of possession with intent to distribute marijuana in excess of 50 kilograms (110.23 pounds). The thrust of Paiz's argument is that although the evidence shows he was hauling car-loads of marijuana to Florida, it does not show for each trip underlying counts 14, 15, and 16 the amount or weight of the marijuana carried. But the record establishes, again and again, that "loads" of marijuana were 150 to 200 pounds. Indeed, in one case in which a coconspirator transported an "incomplete" load of marijuana, the "incomplete" load weighed 50 kilograms. An easy

and reasonable inference, then, is that the "full" loads carried by Paiz in counts 14, 15, and 16 were in excess of 50 kilograms. Consequently, the evidence is sufficient to sustain Paiz's enhanced sentences.

The sentences of Paiz must stand. So too must those of the other appellants, with the exception of Tim Rector, whose terms of supervised release must be changed to terms of special parole.

Accordingly, appellants' convictions are AFFIRMED, as are their sentences, with the exception of Tim Rector's sentences on counts 27, 31, and 33. Those sentences are VACATED, and Tim Rector's case is REMANDED for resentencing consistent with this opinion.

It is so ordered.